JEFF GILLESPIE V. THE STATE.

No. 2800.    Decided March 14, 1914.

Rehearing denied April 22, 1914.

**1.—Seduction—Indictment—Mistake—Transcript.**

Where it appeared in the transcript that the indictment did not conclude "against the peace and dignity of the State," but this was found to be a mistake of the clerk, there was no error.

**2.—Same—Special Term of District Court.**

Upon trial of seduction, there was no merit in defendant's proposition that the special term of the District Court was unauthorized by law.

**3.—Same—Evidence—Conditional Promise—Charge of Court.**

Where defendant contended that the act of intercourse was had upon a conditional promise that defendant would marry prosecutrix if she became pregnant, but the record showed that no such conditional promise occurred when the first act of sexual intercourse took place, but that the same was had upon defendant's promise to marry prosecutrix, there was no error in the court's failure to submit the question of such conditional promise to the jury.  Davidson, Judge, dissenting.

**4.—Same—Bill of Exceptions—Cross-examination.**

Where the bill of exceptions as accepted by the defendant, with reference to his objections to the cross-examination of prosecutrix, did not show any error, or that it was on the ground that there was a conditional promise to marry her by defendant when the first act between them occurred, there was no reversible error.

**5.—Same—Evidence—Character of Prosecutrix.**

Where the testimony introduced by defendant to the effect that prosecutrix was caught in a compromising attitude with another man was either untrue or a mistake, and even if true, was at least a year and two months after defendant had debauched her, there was no error in the court's failure to charge thereon. Davidson, Judge, dissenting.

**6.—Same—Accomplice—Corroboration—Charge of Court.**

Where, upon trial of seduction, the court's charge on accomplice testimony properly applied the law to the facts, there was no error on this ground, and the same was in accordance with the statute and approved precedent.

**7.—Same—Corroboration—Sufficiency of the Evidence.**

The corroborating evidence of the accomplice need not in itself show defendant's guilt without and exclusive of the accomplice testimony; if it tends to connect the defendant with the commission of the offense, the same is sufficient, although the same alone may be slight and entitled to but little consideration.

Following Warren v. State, 67 Texas Crim. Rep., 273, and other cases. But in the instant case, the corroboration of the accomplice is not only ample by the acts and declarations of the defendant himself, but also by the surrounding circumstances in evidence. Davidson, Judge, dissenting.

**8.—Same—Charge of Court—Promise of Marriage—Corroboration—Requested Charge.**

Where, upon trial of seduction, the court gave a full charge wherein he told the jury the various things they must acquit defendant on unless they believed the same beyond a reasonable doubt, to which there was no objection, and the court refused to give a requested charge because it was covered in the main charge, with reference to defendant's promise of marriage upon the testimony of prosecutrix and that the same must be corroborated, there was no error; besides, it was improper to single out any one fact, as the special requested charge attempted to do with reference to defendant's promise to marry, as the prosecutrix need not be corroborated in each and every particular. Following Nash v. State, 61 Texas Crim. Rep., 259, and other cases. Davidson, Judge, dissenting.

**9.—Same—Chastity—Reputation of Prosecutrix.**

While under the circumstances of this case it was permissible to show a specific instance of questionable conduct by the prosecutrix, yet, where the court repeatedly told the defendant that he could do so, which he declined, a reflection upon prosecutrix is thus dispelled, as it shows either that the witnesses that defendant attempted to prove this by would not have so testified or that the State would have disproved it; besides, the prosecutrix's character for chastity was fully sustained by the State's evidence, and it only came in doubt after defendant had debauched her and she became pregnant. Davidson, Judge, dissenting.

**10.—Same—Letter—Evidence—Motive.**

Where, upon trial of seduction, the prosecutrix testified that she had written a letter to defendant and her reasons for doing so, and it was admitted by the defendant that he received said letter, and prosecutrix swore that she had told him the reason she had written for him to come back and explained the matter to him fully, which the defendant did not deny, there was no error.

**11.—Same—Evidence—Mother of Prosecutrix—Conduct of Prosecutrix.**

Where the bill of exceptions showed that the prosecutrix testified that her mother was dead, and alleged nothing as to the dramatic manner of the witness in so testifying, and it was thus accepted by the defendant, there was no reversible error. Following Kearse v. State, 68 Texas Crim. Rep., 633. Davidson, Judge, dissenting.

**12.—Same—Reputation of Prosecutrix—Chastity—Hearsay.**

Hearsay testimony of a State's witness, proposed to be proved as to what he said to another the next day after the transaction occurred with reference to an alleged indiscretion of prosecutrix, was inadmissible in evidence upon trial of seduction; besides, there was no intimation in the bill of exceptions or any other testimony that any improper relationship whatever occurred between said State's witness and the prosecutrix upon the occasion alluded to.

Appeal from the District Court of Kaufman. Tried below before the Hon. F. L. Hawkins.

Appeal from a conviction of seduction; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Woods & Morrow* and *Nelms & Puckett* and *Fred S. Rogers* and *W. F. Ramsey* and *C. L. Black,* for appellant.—On question of contents of

letters: Campbell v. State, 62 Texas Crim. Rep., 561, 138 S. W. Rep., 607; Davis v. State, 61 Texas Crim. Rep., 611, 136 S. W. Rep:, 45; Johnson v. State, 57 Texas Crim. Rep., 488; Shoemaker v. State, 58 id., 518.

On question of accomplice testimony: Goodsoe v. State, 52 Texas Crim. Rep., 626; Landers v. State, 63 S. W. Rep., 557; Simmons v. State, 55 Texas Crim. Rep., 620.

On question of chastity of prosecutrix: Cunningham v. State, 5 Texas Crim. App., 440; Gorzell v. State, 43 Texas Crim. Rep., 82; Garlas v. State, 48 id., 449; Reeves v. State, 10 S. W. Rep., 841; Spenrath v. State, 48 S. W. Rep., 192; Fine v. State, 45 Texas Crim. Rep., 290.

*C. E. Lane,* Assistant Attorney General, *J. S. Terry,* County Attorney, and *Wynne & Wynne,* for the State.

DAVIDSON, JUDGE.—Appellant was convicted of seduction, his punishment being assessed at two years confinement in the penitentiary.

The record discloses that the judge called a special term of the court to meet on the 19th day of May. This seems to have been occasioned by reason of the fact that the Legislature changed the time of holding terms of the District Court in that county. To avoid any possible or probable consequences, the judge called the special term to meet on the same day the regular term convened under the prior law. At the time of calling the special term the new law was not in force and would not be until July. Under previous Act of the Legislature the court in regular term convened on that particular Monday, which happened to fall on the 19th of May. So we have, as a matter of fact, the special term called for the same day that the regular term should have convened. Had the judge not called the special term for that particular day, under the law the regular term would have convened. We are of opinion that there is no merit in appellant's proposition, that the special term was unauthorized by law. It would make no difference that the judge issued his order calling the special term on that day. It would have been the regular day for the term any way. It did not in any way interfere with the two regular terms required by the Constitution for the District Court to be held in the county.

The indictment incorporated in the record fails to conclude "against the peace and dignity of the State," as required by the Constitution. It may be this was an omission on the part of the clerk in transcribing the indictment, but such is the record. This renders the indictment invalid, and for this reason the judgment must be reversed. We notice this question in passing, for by certiorari this defect might be cured by showing it was an omission by the clerk in transcribing the indictment.

There are other matters in the record that will have to be noticed, and which, in our judgment, require a reversal. The prosecutrix testified substantially that appellant and she had been going together since 1907, and became engaged to be married; that when the first solicitation on

his part was made she agreed to and did have intercourse with him under this promise of marriage. She states also, in substance, that he told her if she became pregnant or anything happened he would immediately marry her, and too quick for it to be known. Sometime in 1910 she says the first act occurred, and that it kept up with regularity as occasion presented until a few months before the birth of her child; and that on each of these occasions he promised to marry her. There is evidence also that she went with several other young gentlemen in the neighborhood on various and sundry occasions to different functions, church and other places. Some of these associations with other young gentlemen were shown to have been at night and when she was alone with them. The defendant also introduced evidence to the effect that she was caught in some bushes in a very compromising attitude with one Burton. ·This was denied on the part of the State, and there was evidence pro and con as to whether it was Burton that she was seen with, but the defendant's witness was pretty positive as to this fact. The defendant admits going with the girl and having intercourse with her, but denies there was any promise of marriage.

The court in a general way gave the jury a definition of seduction. Applying the law to the case the jury was informed that if they should find from the evidence that appellant "by a promise to marry her made by him to Lela Heffington, did seduce and obtain carnal knowledge of her, and that she was at the time a chaste and unmarried female under the age of twenty-five years, and that she yielded her person to and had carnal intercourse with the defendant by reason of a promise of marriage made by him to her on which she relied," then he would be guilty. He also charged the prosecutrix would be an accomplice, and that the corroboration would not be sufficient if it merely shows the commission of the offense charged, but it must tend to connect the defendant with its commission, and then from all the evidence the jury must believe beyond a reasonable doubt the defendant is guilty. He then charged them that it was not necessary that the evidence be positive and direct; that she could be corroborated by circumstances which tended to connect the defendant with the commission of the offense charged. Then he gave this clause in the charge: "It is for you to say from all the facts and circumstances in evidence before you whether she has been sufficiently corroborated. and if you find there is an absence of such corroborative testimony, you must acquit the defendant." We notice this clause in passing because of further matters suggested in connection with the court's charge and refusal to give special instructions. We desire to say that it hardly states the rule correctly, to say it is for the jury to say from the facts and circumstances that she has been corroborated; the corroboration must tend to connect defendant with the offense; nor is it correct to require the jury to find there was an absence of corroboration in order to acquit. This changes the burden of proof and requires the jury before they can acquit to find an absence of corroboration. The rule is that she must be corroborated, and unless she is so corroborated the jury will acquit.

It is not the absence of corroboration which requires acquittal, but it is the presence of corroboration that authorizes a conviction, and unless she is corroborated the State has no legal case. Under this rule laid down by the court the jury could not acquit unless they should find that there was an absence of corroboration. The rule is the reverse,—that the State must show the corroboration in order to get a verdict.

The court further charged the jury that if they should believe from the evidence that appellant had carnal intercourse with prosecutrix one or more times, but believe that at the time the first act of intercourse she was not a chaste woman, or if they had a reasonable doubt of that fact, they should acquit, even though the jury might find that such act of intercourse was produced by a promise of marriage, or if they should find that she was a chaste woman at the time of the first act of intercourse between her and defendant, but should find that she yielded to same not because of a promise of marriage, but on account of her own amorous passion or sexual desires, or if they had a reasonable doubt, they should acquit, or if they believed the first act of intercourse between defendant and prosecutrix was induced or brought about by any means other than by a promise of marriage made by defendant to her upon which she relied, or if they had a reasonable doubt thereof, they should acquit, of if they had a reasonable doubt as to whether defendant promised to marry her they should acquit. Various objections were urged to these charges at the time, and appellant asked, among other things, the following charge: "The jury are instructed that in this case you can not find that there was a promise of marriage upon the testimony of the prosecutrix, Lela Heffington, alone, but under the law her evidence as to the promise of marriage must be corroborated, that is confirmed by direct and positive testimony or by circumstances of such a character as to convince the jury beyond a reasonable doubt that her testimony in this respect is true." This charge was refused because the court says it was covered in the main charge. We are of opinion that it was not, and especially in view of the fact that the court charged the jury as above mentioned, that if the jury should find there is an absence of corroboration they would acquit. The special charge should have been given, and under the attitude of this record, the error in the court's charge and refusal to give the special requested instructions, the judgment ought not to be affirmed.

Exceptions were also reserved to the charge because it failed directly and affirmatively to instruct the jury that if the prosecutrix yielded her virtue under promise of marriage to appellant that if she became pregnant he would marry her, he should be acquitted. This was not pointedly given to the jury, and under the testimony we are of opinion it should have been affirmatively charged, and that this particular question should have been called to the attention of the jury in the charge. The testimony of prosecutrix indicates that this may have occurred, and that she yielded her person to him on a promise that if she became pregnant he would marry her.

There are several bills of exception reserved to the ruling of the court on the admission and rejection of testimony. The reputation of the prosecutrix became a leading question in the case. It was attacked for want of chastity and virtue. The appellant supported his theory that she was not a chaste woman and introduced quite a lot of evidence showing she was out at night with other men, and at times and under circumstances which reflected upon her character for chastity, and tended to show that it was not good, that is, that such conduct was a reflection upon her chastity and good name. The State introduced evidence to support her reputation for chastity as being good, and to show that her conduct was lady-like in every respect. This was admitted, it seems from a bill of exceptions, because defendant had shown she had been out at night at unreasonable hours with other men driving around the country. As before stated, to meet this the State introduced evidence of her general standing and reputation for lady-like deportment. The defendant then proposed to prove and offered testimony to show that on one occasion she had a difficulty with a young gentleman at a church in which she called him a damned son-of-a-bitch. There are other bills of a similar nature. The court excluded this testimony, but qualifies the bills by stating that later during the trial he informed defendant he could introduce it, but he failed to do so. Under the wide range of testimony and the attitude in which the case was placed, this testimony was clearly relevant, and should have gone to the jury, and but for the failure of appellant to avail himself of the offer of the court, it would be reversible error. There are two or three bills of this sort, which it is unnecessary to discuss seriatim.

Another bill recites that the prosecutrix was called back by the county attorney and the following matters occurred: She was asked by the county attorney: "You told Mr. Woods this morning that you wrote to him (Jeff) to come back; tell the jury why you did that." Appellant excepted for various and sundry reasons, among others, that it was not proper to state why she wrote for him to return, unless the defendant knew of her reason; that he could not know of those reasons unless he had been informed. The court stated in the presence of the jury: "I do not know whether that is admissible or not. There is no way for me to know what the answer of the witness would be. If you gentlemen would indicate to me about it. . . ." Counsel approached the court while on the bench and they consulted privately. Counsel for both sides then returned to their places at the bar in front of the jury, and the following question was propounded by the county attorney: "Tell the jury why you wrote him to come back?" Mr. Woods, counsel for defendant, excepted because the letter would be the best evidence, and because her feelings and her education on the subject since this suit was begun would be in the nature of manufactured testimony. The court stated "very well," and Mr. Woods excepted to the question and the answer. Mr. Puckett for the defendant remarked: "We want to get our bill of exceptions this way; the letter would be the best evidence,

any reason she had of her own not expressed to defendant would not be binding on the defendant, and would be prejudicial, immaterial, irrelavant and hearsay." And the court's answer was, "All right." The county attorney asked: "Tell the jury why you wrote him to come back?" The witness answered: "I was uneasy." The county attorney further propounded this question: "Why were you uneasy?" And the witness, Lela Heffington, proceeded to answer: "I had missed my sickness four or five days and I was uneasy and wrote to him to come back." Various objections were urged to this, that it was immaterial, irrelevant and had a tendency to prejudice the jury against defendant's rights, etc. We are of opinion this testimony was not admissible, unless it was shown defendant received the letter, and that he was notified in some way of her reasons for wanting him to come back. Her undisclosed reasons would not affect the defendant, and could not be binding on him. Upon another trial, unless these matters are shown in some way to have been brought to the attention of the defendant, they would not be admissible.

Another bill recites that State's counsel asked prosecutrix while on the stand as a witness for the State, if she told her mother. Counsel for defendant then said: "We asked her who she told and she gave one party, Mrs. Wilson," and the court remarked from the bench, "Go on and complete your question, Mr. Terry, and I will rule on it then." Whereupon Mr. Terry asked: "Want to ask you if your own mother was living?" Counsel for defendant objected to said question and manner of examining the witness as being irrelevant and immaterial and prejudicial to defendant's rights. These matters were overruled by the court, and the witness answered: "In a grave and solemn manner of an actress, with tears in her eyes, before the jury, with her head hung down, meaning that her mother was not living at the time when this transaction took place." The mother of prosecutrix had been dead for years, and this question was not germane to what had been asked by defendant. His question was if she had told anybody, and she specified the only one told was Mrs. Wilson. It was not necessary to an explanation of this question or answer that she had or had not told her mother; it was not germane to this question that her mother was dead, and, therefore that she had not told her, especially in view of the fact that she had been dead quite a number of years. The evidence shows that the girl was over twenty years of age, and had a stepmother. Under the Kearn case, 68 Texas Crim. Rep., 633, 151 S. W. Rep., 827, this evidence seems to be admissible.

Another bill recites that the State offered Oleson in rebuttal, who testified that he was acquainted with the general reputation of the prosecutrix in the neighborhood where she lived in 1909 and 1910, for chastity, and it was good, that is to say, witness testified he never heard it questioned. He further testified he was acquainted with prosecutrix and frequently saw her out at parties, and public gatherings in that neighborhood during the two years above mentioned, and that her conduct as observed by him was always that of a lady, and he never ob-

served anything on her part as unbecoming a lady, and after he had so testified the defense asked the witness if Tom Eubank who lived in that neighborhood during 1909, who had also testified for the defense, did not catch him and Miss Lela Heffington, prosecutrix, out on the public road, a public highway, in a buggy between Prairieville and Mabank one night in the early fall of 1909, about midnight or a little after, when he, Tom Eubank, was passing coming from Mabank home to Prairieville; and the witness was also further asked, in view of what he had testified in behalf of the good character and conduct of prosecutrix, the question: "Is it not a fact that you went to Mr. Tom Eubank, the witness, next morning thereafter and privately requested him (Eubank) to never say anything about having seen him (Oleson) and Lela Heffington out together the night before on the public highway at that time of night." This was objected to, but no reason assigned why, and the testimony was excluded. It was stated the witness would answer that he did go to Eubank and make the request the next morning, and this would have been material and if witness had denied it, Eubank would have testified to the facts stated, that is, that he saw Oleson and prosecutrix on the public highway about midnight in the fall of 1909 between Prairieville and Mabank in a buggy, and that Oleson did come to him the next morning and ask him never to say anything about having seen him. We are of opinion this testimony, upon another trial, should go before the jury. The testimony in this connection took widest range, therefore the above was germane.

For the reasons indicated the judgment is reversed and the cause remanded.

*Reversed and remanded.*

HARPER, JUDGE.—I concur in the reversal of the case, but do not think there is any error in the court's charge on corroboration of the witness as it is clearly within the rule, in my opinion, announced in the case of Beeson v. State, 60 Texas Crim. Rep., 39; but the charge of the court was erroneous in not presenting the issue of whether or not she relied on a conditional promise—that if she became pregnant he would marry her.

PRENDERGAST, PRESIDING JUDGE.—I agree with Judge Harper.

ON REHEARING.

March 14, 1914.

PRENDERGAST, PRESIDING JUDGE, and HARPER, JUDGE.—The State has filed a motion for rehearing herein. Appellant has filed a vigorous argument and brief resisting this. We have again reviewed the record and the questions raised and passed upon in the original opinion and are satisfied that mistakes were made in the original opinion and in reversing and remanding this cause. We will, therefore, in this opinion again discuss and decide these various questions.

In the original opinion it was correctly held that there was no error in the court's action in calling a special term of the court. A properly certified copy of the indictment has been furnished this court and filed herein, showing that the indictment concluded properly "against the peace and dignity of the State" and that the omission of these words in attempting to copy the indictment originally in the transcript, was a mistake.

The alleged seduced girl is named Lela Heffington. Appellant's name is Jeff Gillespie. She testified appellant began to keep company with her in May, 1908. "He did not commence going with me regularly until the last of June or July, 1908. He commenced to talk love to me that summer in July and he continued to go with me until he went away to school in September, 1908. From July to September of 1908 he called on me very often, once or twice a week. . . . Defendant and I became engaged to be married the last of August, 1908. We were to be married the next fall." He said: "I saw her real often until 1908. In 1908, I went to the Alexander Collegiate Institute at Jacksonville to study a literary course. . . . I first began going with her regularly, or a good deal in 1909." It was shown by both of them that he started to this school in September, 1908, and attended it only some two or three months. She testified that at his solicitation and upon his profession of love for her they became engaged to be married in August, 1908. She said she loved him and thought he loved her—such were his professions; that she trusted him and believed in him. Not only her testimony but that of various other witnesses shows that he was more attentive to her and took her back and forth to all of the social functions and to church and Sunday school in the neighborhood where they both lived from the latter part of the summer of 1908, until the fall of 1910, when it generally became known in their neighborhood that she was pregnant. It is true that other young gentlemen, during this time, from time to time occasionally waited upon her and accompanied her back and forth to these various functions, but none of them are shown to have been with her anything like as frequently or as continuously as appellant. Their going with her and waiting upon her occurred more particularly when he was away from her to school in 1908, and in the early spring of 1910, while he was absent in Colorado.

In the original opinion it was stated "Sometime in 1910, she says, the first act (of sexual intercourse) occurred." This statement is a mistake. The statement of facts, in giving her testimony, shows that she positively and unequivocally testified again and again that the first act of sexual intercourse between them occurred in February, 1909. He swore positively to the same thing. Nowhere in the statement of facts does either of them testify that the first act occurred in 1910. This mistake in the original opinion occasioned another mistake therein to the effect that she stated in substance that when this first act occurred he told her if she became pregnant or anything happened he would immediately marry

Vol. 73 Crim.-38.

her and too quick for it to be known. The whole of her testimony, without doubt, was that whatever talk was had between them about her pregnancy or his marrying her because thereof, occurred in the spring of 1910, and not when the first act occurred, and that this talk was more than a year after he had seduced and debauched her. Her testimony, taken as a whole, as stated above, not only clearly shows that no such talk occurred between them when he first had sexual intercourse with her, but on the contrary, excludes any such idea and clearly shows that all such talk between them about marrying her in case she became pregnant, occurred in 1910, and not before. Appellant did not dispute her in his testimony. So that this mistake, having been made in the original opinion, was followed up by sustaining appellant's contention that the court should have submitted in his charge the question of her yielding to him and he agreeing to marry her on condition that he got her pregnant. The evidence in no way raised such question and the court clearly did not err in not submitting it.

Her testimony in chief shows that after he returned from school at Jacksonville in November, 1908, he was with her frequently until February, 1909; that there was no difference in his attentions to her after his return and his attentions before then. "He seemed just the same that he been." That about two weeks, a short time, before this first act of intercourse, in taking her back home from church, he first solicited her to extend to him sexual favors. She declined and told him, "I could not do that"; that she was not willing. He said he did not see why, that if she had any confidence in him, he had promised to marry her and he did not see why she could not trust him. That on the next occasion some two weeks later when he talked to her about it and asked her to yield to him, she said: "I did not want to, he just insisted upon the ground that we were going to marry and if I loved him, why not then; that it (would) never be known and would be no harm anyway. We talked about the matter most all the way from there and back from the party. I finally yielded to him on that occasion; I did because I believed him and believed that he intended to marry (me) and loved him and under that ground I did and no other reason." Unquestionably, by both her testimony and that of appellant too, this first act occurred in February, 1909. She reiterated this in her cross-examination distinctly and pointedly. Further, on cross-examination, she testified that from time to time after this first act when they had sexual intercourse and practically every time they did, he promised to marry her or renewed or reiterated his promise of marriage. The statement of facts shows part of her testimony on cross-examination, as follows: "When I yielded to defendant he said that we would marry. He said we would marry before anything like that happened; he said if there was anything of that sort that he would marry; he said that we were going to marry and there would nothing like that happen before it. He told me that he would marry me if I became pregnant, but not then. It was in 1910 that he told me he would marry me if I became pregnant. It was after he came

home from the West. Q. Did he make a solemn promise to you, Miss Lela, to marry you if you became pregnant? Did you believe that he would. A. Yes, sir. Q. Was that the reason then you yielded to him —you relied on that promise, did you? A. Yes, sir, long before 1910. Q. Well, did you rely on it then? A. Yes, if I hadn't believed what he was saying I would not. Q. You believed that he would marry you if you became pregnant, didn't you? A. I believed that he was going to marry me anyhow. Q. Well, if you became pregnant didn't you believe that he was going to marry you? A. Sure. Q. Did you believe that that would hurry up the wedding? A. No, sir." After this testimony by her, on re-examination by the State, on this point she clearly and distinctly testified: "I yielded to defendant the first time because I believed he was true and believed that he loved me—I knew that I loved him—I believed that he would marry me and he had promised to, and under them reasons I submitted. At the times I. submitted after that he said it would never be known, he said we could marry too quick for anything like that to ever interfere. The first conversation I had with defendant about the possibility or probability of my becoming pregnant was after he returned from the West, after I had ·written him the letter, and what I have just stated is what defendant said in connection with that conversation."

Appellant objected to the State re-examining her after his long severe cross-examination of her and when the question and answers above quoted, occurred, because her testimony thereon would be a mere repetition and took a bill thereto on that ground. In qualifying that bill, which was accepted by appellant and is in the record and presented by him as one of the claimed grounds of error in this cause, the court said: "The foregoing bill, in the shape which it is presented, is so incomplete that it can not be approved in its present form, and to make the matter plain to the higher court it will be necessary to incorporate the entire cross-examination of the witness Lela Heffington upon the point involved in this bill. After a long and exhaustive cross-examination of the prosecuting witness, extending over twenty-six pages of stenographic question and answer report an inquiry into the minutest detail of every movement of this witness, the following cross-examination was continued: Q. When you yielded to Jeff Gillespie didn't he tell you that if anything got the matter with you that he would see you out? A. No, he said that he would marry. Q. Ma'am? A. No, sir, he said he would marry before anything like that. Q. He said if there was anything of that sort he would marry— Mr. Wynne: No— Mr. Puckett: We will fix that, ask her what she said. Q. What did you say? A. He said that we were going to marry and there would nothing like that happen before it. Q. Didn't he tell you that he would marry you if you become pregnant? A. Yes, sir, he did, but not then. Q. When was it he told you that he would marry you if you became pregnant? A. In 1910. Q. What time? A. It was after he came home from west Texas. Q. Did he make a solemn promise to you, Miss Lela, to marry

you if you became pregnant? Did you believe that he would? A. Yes, sir. Q. Was that the reason then that you yielded to him, you relied on that promise, did you? A. Yes, sir, long before 1910. Q. Well, did you rely on it then? A. Yes, if I hadn't believed what he was saying I would not. Q. You believed that he would marry you if you became pregnant, didn't you? A. I believed that he was going to marry me anyhow. Q. Well, if you became pregnant didn't you believe that he was going to marry you? A. Sure. Q. Did you believe that that would hurry up the wedding? A. No, sir. Q. You did not think that would hurry up the wedding at all? A. No; I thought that we were going to marry, I never thought anything of that. Q. You say it commenced in 1909 and just kept on until 1910 over a year; how many different times were you going to marry? Q. Well, we were to marry in 1909 and his trip west prolonged it and then we each agreed not to marry when he came back. Q. You each agreed that you would not marry? A. We said we would wait awhile. Q. Didn't you break up at that time? A. No, sir. Q. Didn't you postpone it indefinitely or to some fixed time, or what did you do, after he came back? A. We just agreed that we would wait awhile and see what he could do. Q. You did not have any fixed time then, just the exact day when you would marry, did you? A. No, sir. Q. Did you have a fixed day at any time that you and Jeff Gillespie would marry, when he was having this intercourse with you? A. No, sir, we did not have no day. Q. Did not have any fixed day? A. No, sir, no certain day. Q. He was loving you and you were loving him was that the way of it? A. Well, I was loving him and thought he was loving me.

"After the completion of the cross-examination of this witness she was asked on re-direct examination by the State, the following questions and gave the following answers: Q. They asked you this morning if the defendant promised to marry you in case you got pregnant; tell the jury why you submitted to him in the first instance and what promise, if any, he made you? Objected to as being repetition. The Court: I overrule the objection, in view of the cross-examination on that point. Mr. Woods: Defendant excepts. A. Well, I yielded to him the first time because I believed he was true and believed that he loved me—I knew that I loved him—I believed that he would marry me and he had done promised to, and under them reasons I submitted. Q. What promise did he make you at each and every time thereafter? A. He said it would never be known, he said we could marry too quick for anything like that to ever interfere. Q. When was the first conversation you had with him about the possibility or probability of your becoming pregnant from the relation that was being carried on between you and him? A. It was after he returned from the West. Q. After you wrote him that letter. A. Yes, sir. Q. What you stated to the jury is what he stated in connection with that? A. Yes, sir. The foregoing question and answer report shows what occurred and all that occurred with reference to this matter presented in the bill. The only objection urged by coun-

sel for the defendant was it was a repetition, and as stated by the court, in view of the cross-examination on that point, it was overruled. The other ground of objection, as stated in the original bill, was not presented to the court. With this explanation this bill is allowed. F. L. Hawkins, Judge Fourteenth Judicial District." So that it is perfectly clear that he never intimated any conditional promise to marry her when the first act between them occurred and no such intimation or talk occurred between them on that subject until the spring of 1910, more than a year after he had debauched and ruined her under his solemn engagement and promise to marry her.

The consensus of the evidence, as a whole, clearly shows that before her pregnancy became known and talked about in the community in the summer or fall of 1910, she went to all the social functions in the neighborhood and church and Sunday school, and was received by everybody in the neighborhod in precisely the same way that every other young lady was at the time, and that she went back and forth to these various functions and meetings all this time in the same way that all the other young ladies of the community did and not otherwise; that whatever of her goings and comings in these respects whether at night or day time, or both, were just like every other young lady in the community to the same functions and meetings went and came, and that she was out at night at various of these times with appellant and other young men, in precisely the same way that the other young ladies were, and to and from the same functions and meetings in the same way.

In the original opinion. it is stated: "The defendant also introduced evidence to the effect that she was caught in some bushes in a very compromising attitude with one Burton. This was denied on the part of the State, and there was evidence pro and con as to whether it was Burton that she was seen with, but the defendant's witness was pretty positive as to this fact." Upon a careful review of the evidence on this point, we find this state of facts: Bob Stanfield, appellant's said witness, testified, in substance, that one Sunday evening the last of April, or the first of May, 1910, he was going with Mr. Wills from his son's house to that of Mr. Wills, and that in doing so they passed through a certain pasture where there was a skirt of timber, and that while doing so, some 75 yards off, he saw Miss Lela and some man getting up off of the ground. "They just got up to where I could.see,—I saw them when they got up." He further said that he did not know for certain, but thought. that fellow was True Burton; that that was his best judgment about it; that he didn't think it was appellant, Jeff Gillespie; that he saw no other persons there except those two on that occasion; that said Mr. Wills was standing there with him and looking towards this man and woman at the time he saw them; that Mr. Wills testified in this case on the former trial but since then has died. The State, in rebuttal on this point, introduced the testimony of Mr. Wills given on the former trial. On this point he testified, in substance, that he was with Bob Stanfield at the time Stanfield testified about what he saw and that on that occasion ap-

pellant and not Burton was with Miss Lela and that also his own daughter and Bud Oleson were there together and only some 30 or 40 yards separated from appellant and Miss Lela; that he knew Bud Oleson was there at that time with his daughter because they came right on up to his house following him right on home. Bud Oleson swore positively that he was there with Mr. Wills' daughter on that occasion and that he saw Bob Stanfield and Mr. Wills pass them in 50 yards or closer, and that the appellant was there at the time with Miss Lela. Neither of these parties, Wills or Oleson pretended to testify to any improper attitude by the appellant and Miss Lela on this occasion or between Miss Lela and Burton even if it could have been Burton. Burton swore positively he was not there with Miss Lela on said occasion. Mr. Wills' daughter, who was married at the time she testified in this case, and her name was then Mrs. Knull, testified to altogether a different occasion, she showing by her testimony that "in the fall of 1910" she, Bud Oleson "and Miss Lela Heffington, who was with, as far as my knowledge was, True Burton," and a sister of Miss Lela and Floyd Tedder. In other words, she says, that in the fall of 1910, three couples, she—the witness—and Bud Oleson, Miss Lela Heffington, and she thinks True Burton, and a sister of Miss Lela and Floyd Tedder, were together, taking a walk and that she and Oleson, when they got to the pasture where Stanfield had testified about, as shown above, separated from them and went on home, and that the other two couples continued their walk through the pasture, the three couples being together before she and her companion separated from them, and the other two couples continuing thereafter, although appellant testified fully, he never denied it was he with Miss Lela. So that Bob Stanfield was either mistaken about seeing Miss Lela and Burton in a compromising position or his testimony was untrue. We make this statement and show the state of the evidence in order to remove whatever wrong impression is made in the original opinion as to Miss Lela and Burton being caught in a compromising position. Even if he was not mistaken that he saw *some* man there so with her, this was at least a year and two months after appellant had debauched her.

The court's charge on accomplice's testimony is in full as follows: "You are instructed that under the law the witness Lela Heffington is an accomplice. Now you can not convict the defendant upon her testimony alone unless you first believe her testimony is true and that it shows the defendant is guilty of the offense charged in the indictment, and even then you can not convict the defendant upon said testimony unless you further believe there is further testimony in the case corroborative of her testimony, tending to connect the defendant with the offense charged; and the corroboration is not sufficient if it merely shows the commission of the offense charged but must tend to connect the defendant with its commission, and then from all the evidence you must believe, beyond a reasonable doubt, that the defendant is guilty. In this connection you are instructed that corroborative evidence (need) not be direct and positive; independent of the testimony of Lela Hef-

fington; but proof of such facts and circumstances as tend to support her testimony and which satisfy the jury that she is worthy of credit as to the facts essential to constitute the offense of seduction, as hereinbefore defined to you, and which tends to connect the defendant with the commission of the offense charged, will fulfill the requirements of the law as to corroboration. It is for you to say from all the facts and circumstances in evidence before you whether she has been sufficiently corroborated, and if you find there is an absence of such corroborative testimony, you must acquit the defendant." As we held in the original opinion, this charge is in accordance with the statute and the uniform line of decisions in this State. It is unnecessary to cite either. The latter part of the above quoted charge could in no way have misled the jury to believe that the burden was not upon the State to corroborate Miss Lela.

In this connection, appellant in his reply to the State's motion for rehearing herein earnestly contends that the evidence is insufficient to show that Miss Lela was corroborated as required by law. Some seem to have the idea that the evidence corroborating an accomplice, to be sufficient, must itself show appellant's guilt, without and exclusive of the accomplice's testimony. Why this impression seems to prevail with some, we can not understand, because the reverse of this has always been held by this court and all standard text-book writers. In reviewing this question in the case of Warren v. State, 67 Texas Crim. Rep., 273, 149 S. W. Rep., 130, this court said:

"This court long ago laid down the correct rule on the subject of corroborating the testimony of an accomplice by other testimony tending to connect the defendant with the commission of the offense. In Nourse v. State, 2 Texas Crim. App., 304, after quoting our statute on the subject, as follows: 'Art. 801. A conviction can not be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.' (Code Crim. Proc., 1911), said: 'Before the adoption of our Code, the rules of evidence known to the common law of England, both in civil and criminal cases, governed in this State, and they still govern, except where they are in conflict with the provisions of our Code of Procedure, or some other statute of this State. Under the common law, the rule of evidence as to the corroboration of accomplices is somewhat peculiar. Says Mr. Roscoe: 'It has been repeatedly laid down that a conviction upon the testimony of an accomplice, uncorroborated, is legal. The point was considered by the twelve judges, and so decided in Rex v. Atwood, 1 Lea., 521, and again in Rex v. Durham, 1 Lea, 538.' Roscoe's Cr. Ev., 120, 121, and authorities cited. The evidence of an accomplice is altogether for the jury (under the common law rules of evidence), and the jury, if they please, may act upon it without any confirmation of his statement; but it is held proper for the presiding judge to advise them not to convict if the testimony of the accomplice is uncorroborated.

Under article 3118 of our Code (Paschal's Dig.), the testimony of an accomplice must be corroborated to support a conviction. It has been decided both by the Supreme Court and the Court of Appeals in this State that the term 'accomplice,' as used in article 3118, applies, not only to accomplices in a technical or restrained sense, but to all witnesses who are particeps criminis, whether as principal or accessories. Irvin v. State, 1 Texas Crim. App., 301, and authorities therein cited. It will be seen that, to justify a conviction on the testimony of an accomplice, there must be some evidence which, of itself and without the testimony of the accomplice, tends in some degree to connect the accused with the commission of the crime. The Supreme Court of California (in the case of People v. Melvane, 39 Cal., 614), says: 'The corroborative evidence may be slight and entitled to but little consideration; nevertheless, the requirements of the statute are fully fulfilled if there be any corroborating evidence which of itself tends to connect the accused with the commission of the offense.' This decision was rendered under a statute very similar to ours in regard to the corroboration necessary to be had to the testimony of an accomplice to support a conviction. Article 375 of the (Penal) Code of California is as follows: 'A conviction can not be had upon the testimony of an accomplice unless he be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense, and the corroboration shall not be sufficient if it merely shows the commission of the offense or the circumstances thereof.' It is a mistaken idea to suppose that the corroborating evidence must conclusively of itself connect the defendant with the commission of the offense. If so, there would be no use for the testimony of the accomplice.' See, also, Jones v. State, 4 Texas Crim. App., 529; Toney v. State, 5 Texas Crim. App., 163; Simms v. State, 8 Texas Crim. App., 230; Clanton v. State, 13 Texas Crim. App., 139, and Moore v. State, 47 Texas Crim. Rep., 410, 83 S. W. Rep., 1117. See, also, the opinions of Judge Ramsey and Judge Harper adopting the opinion of Judge McCord, in Nash v. State, 61 Texas Crim. Rep., 259, 134 S. W. Rep., 709, 714 to 716, and 718 et seq."

Now as to the evidence corroborating Miss Lela. She testified positively, as shown above, that she and appellant, at his solicitation, and upon his professions of love for her and upon hers for him, in August, 1908, made an engagement to be married. He denied this and said he never at any time promised to marry her or became engaged to her. As shown above, she further swore positively that it was because of his said promise, and relying thereon, that she yielded to him. He admitted the act at the time she says it first occurred. He said that act was the first. He denied the engagement to marry. Miss Lela's father, C. C. Heffington, swore that Miss Lela told him she and appellant were to be married. She so testified, too. Her father further testified that after the time she said she and appellant were engaged to be married, on one occasion appellant protected her and took a drunken party who was annoying her out of her presence, and that he thanked appellant for this courtesy

and favor shown to his daughter and that appellant then and there replied to him, "That is all right, I expect to marry her," or "I expect to make her my wife." He admitted this courtesy and favor shown by him to Miss Lela on said occasion and the fact that her father thanked him therefor, but denied that he told her father at the time that he intended to marry her, or make her his wife. That question was for the jury to pass upon. After they were engaged, as Miss Lela says, he went off to school, and she swore, and he admitted, that while at school he had written her three cards. They were produced, identified and introduced in evidence; they were all three addressed to Miss Lela by appellant. One of them was merely a Jacksonville scene. On the next he wrote her, "Didn't have time to write before; will write in a short time. Will be in Friday two weeks." On this card was printed, "To my sweetheart." On the other he wrote: "How is everything in dear old Prairieville by now? Say, I may not come Friday; I don't knew yet. Hope I can come if I can get off." On this was printed, "to my darling." All this and the facts hereinbefore and hereafter recited together with the fact of his practically continuous, although not exclusive, attentions upon her, was ample corroborative evidence of their engagement and of her testimony on the subject and that by reason thereof, he debauched and ruined her. (Best v. State, 64 Texas Crim. Rep., 464, 144 S. W. Rep., 589.) In her testimony, without reciting it, she gives a most reasonable explanation of why they did not marry before appellant succeeded in getting her pregnant. In effect, it was that he was young, not then through school, and that while they fixed the time for marriage, for these reasons and the further reason that if he married her at the time at first agreed upon he would have to take her to his parents' house to live. Neither desired this. Both, or she at least, was advised against it. Then he was not settled to any business or occupation, she relying at all times upon the ultimate consummation of their agreement of marriage. He, doubtless, through that means, having accomplished her ruin, and getting her to indulge him in his sexual passion practically whenever he desired, did not intend to consummate the agreement and although after she found that he had gotten her pregnant, she besought him to do so, he peremptorily refused. It is true that he testified to a state of facts which might show, if believed, that he might not be the father of the child, she afterwards bore, yet her testimony and all the facts and circumstances developed in the case with reasonable, if not absolute certainty, shows that he and no other was the father of the child she had. He admitted that he had intercourse with her very soon prior to his trip to Colorado. He fixed that time as February 2, 1910, or prior thereto. She fixed it the latter part of February. In March, when she passed her menstrual period without it coming on, she at once wrote to him and besought his return because thereof. He admitted that he got that letter from her and that he soon thereafterwards returned and saw her. He admits having intercourse with her very soon, if not immediately after his return and a continuation of such acts until

he became certain that she was in that condition. He never claimed in his testimony that he was not the father of her child. She swore he was and that no other ever had sexual intercourse with her. Burton, whom appellant tried to show might have been its father, swore positively he never had sexual intercourse with her. She told appellant of her condition as soon as he returned. He thought she must be mistaken. When it became evident that it was the case, however, she says, he advised her and insisted upon her taking some medicine to produce an abortion. He denied that he advised this, but the druggist, Mr. Jones, swears that along about the time she claimed this occurred appellant bought from him a bottle of ergot and that he, at the time, pasted on the bottle a label, "Fluid Extract of Ergot." She testified that appellant scratched this label off at the time or just before he delivered the bottle to her. He said he didn't; that the druggist never put any label on the bottle. This bottle, without any label, was identified by Miss Lela on the trial and admitted by appellant to be the bottle and it was introduced in evidence. It then showed no label on it. She testified that shortly before she gave birth to this child appellant advised her to go to a rescue home at Arlington and that he gave her the address thereof, and that he furnished her money to go there on and promised more. He admitted this. Freddie Taylor and Bud Oleson, both, in effect, testified that they saw appellant, either the day of, or the next day after it was known that Miss Lela had given birth to a child and that the child was dead, and that when told the baby was dead he threw up his hat around in the air and said that let him out. He denied this. The other two witnesses, however, were unbiased and unprejudiced and no one can doubt that the jury believed them and not him.

In the original opinion, just before quoting a special charge requested by appellant, which was refused by the court, to the effect that they could not find that there was a promise of marriage upon the testimony of the prosecutrix alone, but under the law her evidence as to this promise must be corroborated, etc., the substance of the fourth subdivision of the court's charge wherein he told the jury the various things that they must acquit appellant on, unless they believed such things beyond a reasonable doubt, etc., the opinion states: "Various objections were urged to these charges at the time." Reviewing the record again, we find that this statement just quoted is incorrect, for appellant made no objections to this charge of the court. It was all clearly in his favor. He did request the court to give the said special charge quoted in the opinion, and the court refused to give it because, as he stated, it was covered in the main charge. In our opinion the action of the court was correct. The point was covered in the main charge and amply so. Besides, it is not proper to single out any one fact, like was attempted in this instance, and charge thereon. Again, it is clearly decided by many decisions of this court that the seduced woman does not have to be corroborated in each and every particular of what it takes to constitute guilt of the accused. Nash v. State, 61 Texas Crim. Rep., 259, in Judge

Ramsey's opinion and cases cited by him therein; Williams v. State, 59 Texas Crim. Rep., 347; Beeson v. State, 60 Texas Crim. Rep., 39; Nash v. State, 61 Texas Crim. Rep., 259, 281 in Judge McCord's opinion adopted by this court in said case; Wright v. State, 31 Texas Crim. Rep., 354, and other authorities cited by Judge McCord. The Nash case, supra, as decided in the opinion of Judges Ramsey and McCord, have uniformly and many times been approved and followed by this court since then and down to this date. The court below correctly refused appellant's said special charge.

· As stated in the original opinion the reputation of Miss Lela, the prosecutrix, for chastity, became a question. The appellant introduced some fourteen witnesses, who, in effect, testified to her bad reputation in this respect. Some three of these were kinfolks of appellant. The greater number of the others, taking their testimony as a whole, tend quite strongly to show that they were speaking of her reputation in this respect after it became known in 1910, that she was pregnant. This was more than a year after appellant had seduced, debauched and ruined her. One can not read their testimony without being impressed with the fact that their testimony as to her bad reputation was founded upon appellant's connection with her and long after he had seduced her. On the other hand, the State introduced a like number of witnesses of both sexes, young and old, one a young lady school teacher; another a justice of the peace, all of whom swore that her reputation was good and that it only became bad about the summer of 1910, after it became known and talked about that she was in a pregnant condition. In order to cast reflection on her, appellant also proved that she rode out at night and went back and forth to the various social functions, to church, etc., with young men at night,—sometimes in a buggy, and sometimes walking. As stated above, taking the testimony as a whole, one can not but be forced to the conclusion by the testimony of all of the witnesses that this young lady went back and forth with young men and appellant, just like every other young lady in the same neighborhood continuously did, and there is no instance of any indiscretion on her part in this respect, that does not equally apply to every other young lady in the neighborhood during the same time. In the original opinion, after stating briefly and generally these matters, it is stated, in effect, that under these circumstances appellant offered to prove that on one occasion she had a difficulty with a young gentleman in a church in which she called him a damn son-of-a-bitch, and that there are other bills of a similar nature; and, it is stated herein that the court excluded this testimony but qualified the bills stating that later he informed the defendant he could introduce all this character of testimony, but he failed to do so. As stated in the original opinion, this testimony was admissible, but, taking the record on the subject, it shows either that the witnesses that he attempted to prove this by, would not have so sworn, or that the State would have disproved it, for when the court repeatedly told appellant's attorneys that they could introduce such proof, they declined to offer it; and, under

the circumstances, we take it, this dispels any reflection upon the young lady attempted to be raised by said bills.

In discussing another one of appellant's bills in permitting the testimony of Miss Lela, the prosecutrix, that she had written a letter to appellant while he was in Colorado, the bill is stated pretty fully, the original opinion, in concluding this subject, stated that this testimony by the prosecutrix was not admissible, unless it was shown defendant received the letter and he was notified in some way of her reasons for wanting him to come back and that her undisclosed reasons would not affect him and could not be binding on him, and concludes by stating that upon another trial, unless these matters are shown in some way to have been brought to the attention of the defendant, they would not be admissible. Upon a further review of the record all these conditional statements in the original opinion of how and when this testimony would be admissible were fully and completely shown. The appellant himself swore that he received the said letter Miss Lela wrote him while in Colorado; that after he came back he saw her about it and she swore she then told him the reason she had written for him to come back and explained the matter to him fully. He did not deny it, but, in substance, admitted that she had told him, and told him the reasons and it was at this time he procured for her the medicine to produce an abortion. So that when we review the record, we find that the action of the court in permitting this testimony was correct.

In the original opinion one of appellant's bills is recited about Miss Lela, the prosecutrix, testifying that her mother was dead. The bill, as the opinion shows, tells about the grave and solemn manner with tears in her eyes and as an actress before the jury with her head hung down, she told the jury that her mother was dead. Upon reviewing the record upon this question we find, which is not stated in the original opinion, that the court qualified this bill by stating, "Approved as to the fact . . . manner of witness not." As we understand this qualification it distinctly disapproved what the bill stated as to her manner in testifying. The appellant accepted this bill this way and he is bound thereby. So that we conclude that while she was asked the question whether her mother was or not living that no such dramatic manner of question or answer occurred, but as held in the original opinion this evidence was admissible. Kearse v. State, 68 Texas Crim. Rep., 633, 151 S. W. Rep., 827.

In another bill and the only other one discussed in the original opinion, it is shown that the State offered C. Oleson, who testified to the good reputation of said prosecutrix for chastity and that he never observed anything of unladylike conduct in the prosecutrix at any time, but, on the contrary, that her conduct was that of a nice lady. The complaint in this bill is that the court did not permit the appellant to ask this witness, on cross-examination, if he did not go to Tom Eubank the next morning and privately request Eubank never to say anything about seeing him and prosecutrix out together the night before on the public

highway at that time of night. It is not stated in the original opinion that the court qualified this bill, but we find upon a review of the record, that he did qualify it as follows: Foregoing bill approved with explanation that Eubank's testimony and George Wells' testimony (the two being together in a buggy) was admitted as to meeting Christian Oleson and Miss Heffington, the circumstances and act, also Oleson's testimony on this point, but any subsequent (statement) of Oleson was not admitted. See statement of facts for testimony of Eubank, Wells and Oleson on this point." By an examination of the testimony of this witness Oleson, as referred to by this qualification, we find that he testified in substance that he was out buggy riding with Miss Lela, prosecutrix, about the time inquired about, and that somewhere between 11 and 12 o'clock, he met two gentlemen, one of whom he supposes was Mr. Eubank, and that another couple Sam Jordan and Miss Mary Yates in another buggy were along with him at the time. Tom Eubank testified that he and George Wells, the party who was with him in the buggy on this occasion, had to go to Mabank from Prairieville; that they left Prairieville after night, attended to their business at Mabank and then returned to Prairieville, reaching Prairieville about midnight, or a little after. "As we came into town (evidently meaning Prairieville) near the turn of the road at a blacksmith shop, we were traveling pretty fast. I came very near running over a boy by the name of Christian Oleson and Miss Lela Heffington. Mr. Sam Jordan and Miss Mary Yates were just behind them. Christian Oleson and Miss Lela Heffington, the prosecuting witness in this case, were in a buggy to themselves. They were going towards Mabank on a road leading south from Prairieville. What I have detailed above took place long before this controversy between Jeff Gillespie and Miss Lela Heffington, now in court."

Said Wells testified that he and said Eubank, on this occasion, met said Oleson and Miss Heffington right at the blacksmith shop just as he came into the Prairieville road. "We met two buggies, and just as we got in the middle of the street we met twenty-five, twenty or twenty-five more people; I rather think they had been to a party because they were all young people. They were just right in the middle of the street you may say, mighty near all together." On cross-examination he testified: "I remember this meeting because as we came in Tom says, 'Who were those?' I told him who they were, and 'Hell, the whole town is up,' he said when we ran into the other bunch." The prosecuting witness, Miss Lela herself, testified substantially about taking this ride, the two couples of them,—she and Oleson and Jordan and Miss Yates. They went along together. Certainly it can not be contended, with any show of reason, that under such circumstances the appellant had the right to the purely hearsay testimony of Mr. Oleson to Eubank, the next day as claimed by this bill. There is no intimation in this bill or the testimony of any or either of these witnesses, or any other, that any improper relationship whatever occurred between Oleson and Miss Heffington on this ride in company with the other couple. Concede, for the sake of

argument, that these two ladies taking a ride with these two young gentlemen with whom they had gone to this party that night, as they returned home with them, was an indiscretion, the hearsay testimony of Oleson, proposed to be proved as to what he said to Eubank the next day, even if it occurred, was without doubt inadmissible on any theory in this case.

We have reviewed also all of appellant's complaints in this case. We have not discussed them all and did not in the original opinion. It is unnecessary to do so. None of them show any reversible error.

The State's motion for rehearing is granted, the judgment of this court reversing and remanding this cause heretofore entered will be set aside, and the judgment of the court below will now be affirmed.

*Affirmed.*

[Rehearing denied April 22, 1914.—Reporter.]

DAVIDSON, Judge (dissenting).—The State has filed a motion for rehearing. The original opinion states that the indictment was insufficient in that it did not conclude "against the peace and dignity of the State," but it was treated in the original opinion as if the clerk made an omission in transcribing the indictment. On rehearing it is shown that such was the case, and a certified copy of the indictment attached to the motion shows it did conclude "against the peace and dignity of the State."

Another ground of the motion is, it is contended the writer of the opinion was in error in holding the charge on accomplice testimony with reference to corroboration erroneous, and it is insisted in the motion that the charge was sufficient as found by the majority of the court qualifying the opinion written by the writer. That part of the motion is disposed of by stating, inasmuch as the majority hold it was sufficient, this ground of the rehearing is superfluous. I did not agree with my brethren about that, but the majority opinion controls. It is unnecessary to notice that further.

It is contended also the opinion is in error in holding the court erred in not charging the jury that if the prosecuting witness yielded to the embraces of the accused and permitted him to have intercourse with her upon a conditional promise of marriage, that is a promise of marriage if she should become pregnant, they would acquit, inasmuch as there is no evidence calling for such charge. The motion admits on cross-examination prosecuting witness testified that appellant promised her if she became pregnant he would marry her, but the motion contends "her evidence, taken as a whole, clearly discloses that she had carnal intercourse with the appellant the first time in February, 1909, and not in 1910 as stated in the opinion of the court, and that such first act of intercourse was upon a sole unconditional promise of marriage," etc. An examination of the record rather tends to support the contention of the motion that the act of intercourse did occur in February, 1909 instead of 1910, as stated in the opinion. It may have been the

fault of the writer in dictating the original opinion in calling the year 1910 instead of 1909, but that mistake was beneficial to the State. If the promise was conditional, or there was an issue on that question, the court should have charged that favorable to the defendant. That is an axiomatic rule. At least it has heretofore been the law in Texas. It is for the jury to say where there is an issue in the case as to whether the testimony, taken as a whole, leads to one conclusion or another; the jury should settle that and not the court. Referring to the statement of facts, in order to be a little specific in the face of the criticism in the motion, I find she testified as follows: "The first effort of defendant to take any liberties with me occurred in February, 1909. I was not willing; he did not see why, if I had any confidence in him, he had promised to marry me, he did not see why I could not trust him, if ever, and I believed him. He talked to me about this just one time before I yielded to him. The improper relation began at the time of the first conversation, that night. Prior to this he mentioned the matter to me coming from church; this may have been two weeks before, a short time before. I told him at that time I could not do that. . . . On the next occasion after the first conversation on this subject he just asked me to yield to him. I did not want to. He just insisted upon the ground that we were going to marry and if I loved him why not then, that it never would be known, there would be no harm any way. We talked about the matter most all the way there and back from the party. I finally yielded to him on that occasion; I did so because I believed him and believed that he intended to marry and loved him and on that ground I did and no other reason." Speaking further of this she testified: "He said we would marry before anything like that happened; he said if there was anything of that sort that he would marry; he said that we were going to marry and there would be nothing like that happen before it. He told me that he would marry me if I became pregnant, but not then. It was in 1910 that he told me he would marry me if I became pregnant. It was after he came home from the West. Q. Did he make a solemn promise to you, Miss Lela, to marry you if you became pregnant? Did you believe that he would? A. Yes, sir. Q. Was that the reason then that you yielded to him—you relied on that promise, did you? A. *Yes, sir, long before 1910.* Q. Well, did you rely on it then? A. Yes, if I hadn't believed what he was saying I would not. Q. You believed that he would marry you if you became pregnant, didn't you? A. I believed that he was going to marry me anyhow. Q. Well, if you became pregnant didn't you believe that he was going to marry you? A. Sure. Q. Did you believe that that would hurry up the wedding? A. No, sir."

Germane to this and as shedding light upon it, the girl testified that the act of intercourse occurred in February, 1909. This indictment was returned in January, 1911. Under her statement of the evidence intercourse occurred between them from February, 1909 to 1911. This should be viewed in connection with her statement on cross-examination to the

effect that he would marry her if she became pregnant and all the facts in evidence. I am still of the opinion that the question of conditional promise of marriage was a grave issue in the case. If the issue is there, the jury must decide it. The strength of the testimony and weight of it, and the credibility of the witnesses our law relegates to the jury. The testimony may not be very strong or cogent, or it may be, but when the issue is in the case, the charge should submit it, especially when it is favorable to the accused. The girl is considerably older than the defendant, and she was carrying on this intercourse with him for nearly two years before the indictment was found. She became pregnant, and the facts are in serious controversy as to whether defendant could be the father of the child. If his testimony is true he could not have been, because the child was born about ten months after he had intercourse with her. She says he had intercourse with her just before he left Texas for Colorado, and this under her testimony was in latter part of February, but he says it was about the first of February. If he is correct about it, the child was born about ten months after he had intercourse with her, and there is considerable testimony to the effect that she may have had intercourse with one or more other young men in the meantime, but those are all issues for the jury under appropriate instructions from the court. Under her evidence it was more than nine months. It has been decided in Texas, and by this court, that where the prosecutrix consents to intercourse as soon as suggested and promise of marriage appears to be but of slight inducement, evidence is insufficient. Garlas v. State, 48 Texas Crim. Rep., 449; Simmons v. State, 54 Texas Crim. Rep., 619. Now she states that on the first occasion she did not consent to it, but on the second occasion—about two weeks subsequent to the first conversation—she did agree to it; that they talked about it all the way to the party and back, and she finally agreed. This was a matter of a lengthy parley and conversation, and not upon a "sudden impulse." The amicable agreement was after mature deliberation and a promise to marry if pregnancy resulted. It is also held that continuous association and intercourse for about two years after the alleged promise of marriage is not sufficient to corroborate the promise of marriage, but rather serves to destroy the idea of marriage. Spenrath v. State, 48 S. W. Rep., 192; Fine v. State, 45 Texas Crim. Rep., 290; Nolan v. State, 48 Texas Crim. Rep., 436. Again it was said if defendant had no intercourse with prosecutrix for ten months prior to the birth of her baby, it was very unlikely he was the father of her child. Jeter v. State, 52 Texas Crim. Rep., 212. All these matters being in the record, certainly the court ought to have charged with reference to conditional promise. Nor will it do, as a legal proposition, to agree with State's counsel, that a charge must not be given if upon an inspection of the whole of the testimony, the charge ought not to have been given. That is rather a peculiar way to state the proposition. The rule is, if from the testimony of any one witness or the testimony as a whole there is a favorable issue for the defendant, his side of the law must be charged applicable to that issue. In other

words, the rule is fundamental in Texas, or has heretofore been held so to be, that the charge must be given to the jury so as to cover every favorable phase of the case for the defendant. If it should arise from the testimony as a whole, it ought to be given; if it should arise from the testimony of any one or more witnesses, it ought to be given; if it should arise from the defendant's own testimony, it ought to be given.

The motion for rehearing ought to be overruled.