BUN CAREY V. THE STATE.

No. 2851    Decided April 8, 1914.

Rehearing denied May 27, 1914.

**1.—Murder—Charge of Court—Self-defense—Retreat.**

Where, upon trial of murder, the court aptly charged, in submitting the law of self-defense, that defendant was not bound to retreat in order to avoid the necessity of killing his assailant, the same was sufficient, in the absence of a charge on provoking the difficulty or other limitation on defendant's right of self-defense.   Davidson, Judge, dissenting.

**2.—Same—Charge of Court—Self-defense—Right of Carrying Arms.**

Where the court did not charge on provoking the difficulty or otherwise curtailed defendant's right of self-defense, either generally or because of threats, but in the broadest and most comprehensive sense embraced both of these subjects completely and aptly in defendant's favor, a complaint that the court failed to charge on defendant's right to carry arms in his necessary defense was untenable.   Following, Williford v. State, 38 Texas Crim. Rep., 393, and other cases.

**3.—Same—Charge of Court—Self-defense—Defensive Issue.**

Where, upon trial of murder, the State did not contend that defendant ought to have gone and traveled a certain road, and not have traveled the one he did travel, but it was conceded that this was the usually traveled road, and this matter was only brought in for the purpose of showing whether a certain State's witness could have seen the deceased, etc., complaint that the court ought to have told the jury in his charge on self-defense that defendant was not bound to take some other road or diverge from his usual course in order to avoid meeting the deceased was untenable, and there was no error.   Davidson, Judge, dissenting.

**4.—Same—Charge of Court—Self-defense—Threats—Words and Phrases.**

Where, upon trial of murder, the evidence showed clearly that many threats were in fact made by the deceased against defendant and communicated to the defendant, an objection that the court's charge required the jury to believe that the threats relied on had been actually made, was untenable under article 743, Code Criminal Procedure, and there was no reversible error on this ground, and the inadvertent use of the word "excuse" for the word "execute" could not have misled the jury.   Davidson, Judge, dissenting.

**5.—Same—Charge of Court—Self-defense—Serious Bodily Injury.**

Where, upon trial of murder, the court gave a full charge on self-defense which, as a whole, aptly applied to the facts, a complaint that the court charged the jury that the threats made by deceased against the life of the defendant or to inflict serious bodily injury was used in the conjunctive instead of the disjunctive, was untenable, as the evidence showed beyond controversy that the threats applied both against the defendant's life and to do him serious bodily injury, and were not only made to others and communicated to defendant, but were in fact made in his presence and hearing, and there was no error under article 743, Code Criminal Procedure.   Davidson, Judge, dissenting.

**6.—Same—Evidence—Bill of Exceptions.**

Where defendant's bill of exceptions, as qualified by the court, showed no error in the court's action in excluding certain testimony, there was no reversible error.

Appeal from the District Court of Erath.   Tried below before the Hon. W. J. Oxford.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

W. F. *Ramsey* and *C. L. Black* and *Cook & Nugent,* for appellant.—On question of court's charge on threats and self-defense: Gaines v. State, 63 S. W. Rep., 623; Sebastian v. State, 57 S. W. Rep., 820; Watson v. State, 50 Texas Crim. Rep., 171, 95 S. W. Rep., 115; Pratt v. State, 50 Texas Crim. Rep., 227, 96 S. W. Rep., 8; Mitchell v.·State, 50 Texas Crim. Rep., 180; Hightower v. State, 56 Texas Crim. Rep., 248, 119 S. W. Rep., 691; Thomson v. State, 49 Texas Crim. Rep., 384, 93 S. W. Rep., 111; Darnell v. State, 58 Texas Crim. Rep., 585, 126 S. W. Rep., 1122.

C. *E. Lane,* Assistant Attorney General, for the State.—On question of court's charge and typographical error therein: Champ v. State, 32 Texas Crim. Rep., 87; Jones v. State, 35 id., 565.

PRENDERGAST, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree and his punishment fixed at ten years confinement in the penitentiary.

It is unnecessary to make any extended statement of the evidence. It raised the issue of murder in the first and second degrees, self-defense generally, as well as self-defense predicated on previous threats. The court also charged on manslaughter.

Appellant and deceased, Will Griffin, were both tenants on the Cage farm and had been for some time. They lived 400 or 500 yards apart and in the same field. The land they, respectively, rented adjoined. No fence separated them,—merely a turn-row. For some weeks prior to the killing deceased claimed that appellant was trespassing on his part of the land and taking some of his away from him and complained to appellant and others thereabout. Appellant denied this and claimed that he was not trespassing on any of deceased's land but had only his own. Appellant claimed there was no ill-will on his part towards deceased because of any of the troubles between them, but that deceased had ill-will towards him thereabouts. On the morning of the killing, March 17, 1913, appellant had a business engagement in the town of Stephenville, some three or four miles distant. He, at first, intended to go horseback but his wife, learning he was going and wanting some groceries and another article, wanted him to go in his wagon, but he claimed he didn't have time to do all the shopping she wanted done, and instead of going in his wagon he would go in his buggy and get her the groceries she wanted. He thereupon hitched his horse to his buggy and started to town. The road to town went from his house straight down beyond deceased's house. That was the only practicable road to town and the one, not only usually traveled by all the other neighbors, but by appellant himself. When he started to town he took with him his .32-caliber, 9-ball pistol on his person.

Vol. 74 Crim.-8.

Notwithstanding the said trouble between appellant and deceased of several weeks standing, each had been at work from time to time and practically all the time in their respective fields. The deceased, during the time worked up to within 75 or 100 yards of appellant's house. On the morning of the killing and before he started to town appellant had been in another direction a few miles on horseback to look at some yearlings and attend to some other business. He took with him his pistol on that occasion. The deceased that morning was working his land in his part of the field with a double team, cutting stalks with a riding stalkcutter. One end of the rows where he was cutting stalks, bordered on said road, and in his work, going from one end to the other, he approached near said road when he would turn his team and stalk-cutter around and start in the opposite direction. Appellant said he did not know at the time he left his home or started to town or prior thereto that deceased was at said work in his field, and that he did not see him or know that he was so at work until he had gone some distance from his home and got fifty or seventy-five steps from him when he discovered him. Then the deceased had turned his team at the end of the rows starting from the road again. That he said nothing to deceased and deceased said nothing to him, until appellant got about opposite the deceased, the deceased up to that time being at or on his stalkcutter. Appellant testified that deceased then said to him: " 'Carey, God damn you, stop.' I told him, 'Will, go on and leave me alone, I don't want no trouble with you,' and he said, 'Carey, I am going to kill you,' and I told him to take the land and go on with it and he came on with the same words, said he would kill me." Appellant then further testified that the deceased approached to within one or two steps of him, run his hand in his pocket and he then got his pistol and shot deceased in self-defense while deceased was thus near to and approaching him and in the act of assaulting him. Appellant claims he sat in his buggy and never got out of it during the whole time up to the shooting. Appellant claims that he shot at him three or four times. Others who heard the shots, in effect, say several times. It was shown, without contradiction, by an examination of the body of the deceased that two balls only struck him—one in the left side of the left leg four inches below the knee, the ball striking the bone; that the only other shot that struck him entered his body two inches to the left of his left nipple, went entirely through the body and emerged under the arm pit of the right arm; that this ball went through the aorta and killed him. The effect of the doctor's testimony is that the wound was immediately fatal and deceased could not have gone any distance after being so shot. The body of deceased was found, as the witnesses show, from ten to seventeen steps from the road in which appellant sat in his buggy; that his feet were towards the road and his head further therefrom, his left hand down towards his side and his right extended up above his head; that immediately after the first shot, witnesses hearing it, saw deceased's team running away. Deceased's body was searched and he had no weapon of any kind on or about his

body when killed, and had only a small pocket-knife in his pants pocket and it closed. Deceased's wife testified he had no weapons of any kind. Just after the shooting appellant ran down the road towards deceased's house some distance, from 50 to 100 yards, then turned and drove rapidly in a lope back to his own home. Upon reaching it, Mrs. Head, who was one of his neighbors and visiting his wife when he started to go to town, and when he thus returned, testified, in effect, that when she heard the first shot she was in the house but at once went to the door and thence to the front gate and that as appellant ran up to his house, said to his wife, "Lottie, run look in the trunk and get me some more cartridges, I will make that damn son-of-a-bitch threaten to kill me." And he further said he would go down there and finish him up, and kill the whole family if they monkeyed with him; that she beseeched him not to go back down there because she was afraid that deceased's brothers would kill him, appellant, if he did. Appellant took his horse out from the buggy as quickly as he could, saddled him and went in a fast lope to Mr. Lucas' who was in sight in his field some distance away and when he ran up to Lucas he said: "Mr. Lucas, I want you to go and 'tend to Will." Lucas said, "What is the matter?" Appellant said, "He threatened to kill me and I shot him." Lucas said, "Where at?" and appellant said, "Down in his field," and appellant immediately rapidly rode away.

Several witnesses testified that very soon after the killing, some of them hearing the shots and their attention being attracted to the place of the shooting thereby, went to the body of the deceased; that they examined for the tracks of the deceased at the time and found that his tracks where he had stopped his stalkcutter on this occasion showed that he was not nearer than about ten steps from the said road and that none of his tracks there showed that he went near the road.

Unquestionably appellant's testimony raised self-defense in his favor. His, and the testimony of others also raised self-defense based on threats of the deceased.

Appellant requested several charges on these subjects and in some particulars attacks the charge of the court thereon. We will, therefore, here quote the whole of the court's charge on these subjects. It is:

"26. Upon the law of 'self-defense' you are instructed, gentlemen, that homicide is permitted by law when inflicted for the purpose of preventing the offense of murder or the infliction of serious bodily injury, when the killing takes place under the following circumstances: First: It must reasonably appear by the acts or by the words coupled with the acts of the person killed that it was the purpose and intent of such person to commit such murder or to inflict such injury. Second: The killing must take place when the person killed was in the act of committing such murder or of inflicting such injury or after some act done by him showing evidently an intent to commit such murder or to inflict such injuries.

"27. A party whose person is unlawfully attacked is not bound to re-

treat in any event in order to avoid the necessity of killing his. assailant.

"28. An attack upon the person of an individual, in order to justify homicide, must be such as produces a reasonable expectation of fear of death or some serious bodily injury. But in this connection, you are instructed that it is not necessary to the right of self-defense that the danger did in fact exist; if it reasonably appears from the circumstances of the case that danger existed, the person threatened with such apparent danger had the same right to defend against it and to the same extent that he would have were the danger real, and in determining whether there was reason to believe that danger did exist, the appearance must be viewed from the standpoint of the defendant and from no other standpoint.

"29. Now, therefore, if the defendant killed the deceased he was justified in doing so, if he did so to prevent the deceased from murdering or. inflicting serious bodily injury upon him, the defendant, provided it reasonably appeared to the defendant by the acts or by the words coupled with the acts of the deceased, taking into consideration the relative strength of the parties and other circumstances of the case, that it was the purpose and intent of the deceased to murder the defendant, or to inflict serious bodily injury upon him, the defendant, provided the killing took place while the deceased was in the act of committing such murder or of inflicting such injury on the defendant or after some act done by him showing evidently an intent to murder the defendant or to inflict serious bodily injury upon him, the defendant, viewed from the defendant's standpoint.

"30. Where the defendant accused of murder seeks to justify himself on the ground of threats against his life he may be permitted to introduce evidence of the threats. made, but the same shall not be regarded as affording a justification for the offense unless it be shown that at the time of the homicide the person killed, by some act then done manifested an intention to excuse (execute) the threat so made.

"31. Now if you believe from the evidence in this case that prior to the homicide the deceased had made threats against the life of the defendant and to inflict serious bodily injury on defendant and that at the time of the homicide the deceased, by some act then done manifested an intention to excuse (execute) the threats so made, or if you have a reasonable doubt as to whether or not he did, then you will give the defendant the benefit of such doubt and acquit him.

"32. Again, if you believe from the evidence in this case that the deceased unlawfully attacked the person of defendant or if it reasonably appeared to the defendant, viewed from his standpoint, that the deceased was about to make, or was in the act of making, an unlawful attack upon him, the defendant, or if you have a reasonable doubt as to whether or not the deceased did make such an attack or was about to make such an attack, or as to whether or not it reasonably appeared to the defendant that the deceased was about to make such attack, viewed from the stand-

point of the defendant, then you are instructed that the defendant was not bound to retreat in any event in order to avoid the necessity of killing the deceased."

. It will be seen from this charge that the court charged self-defense and defense based on threats, without in anyway charging on provoking the difficulty or in anyway limiting or circumscribing appellant's defense on either of these grounds.

Appellant requested, but the court refused to give, his special charge No. 3, which is, omitting the heading:

"The party whose person is unlawfully attacked is not bound to retreat in order to avoid the necessity of killing his assailant. Therefore you are instructed that if you believe from the evidence in this case, that the defendant, Bun Carey, knew that the deceased, Will Griffin, was working in his field by the side of the public road which Carey usually traveled in coming to Stephenville, and Carey was traveling said road on his way to Stephenville at the time of the homicide, defendant was not bound to take some other road to town or diverge from his course in order to avoid a meeting with the deceased, and the defendant had the further right to arm himself to protect his life against any former or expected attack upon him by the deceased, and to carry said arms whenever and wherever he believed his life to be in danger, and was not bound to retreat in any manner, and the fact that he did so, would not in any manner militate against, alter, or abridge his right of self-defense if he acted upon the reasonable appearance of danger or serious bodily injury, or death, either one or both, at the time of the homicide." Appellant claims that the court's charge, above quoted, did not apply the law given therein, that when a person is·unlawfully attacked he is not bound to retreat in order to avoid the necessity of killing his assailant. It is not shown by his contention, and we can not understand, how it could be more aptly or completely applied to this case, than it was by the charge of the court above quoted. It specifically tells the jury this in the first part of the charge and again in the latter part, and no possible injury could have occurred to appellant by not further applying it, nor can we understand how it could have been otherwise applied than it was by the court's charge. Again, he complains that the court did not tell the jury that, in view of the threats by deceased, appellant had the right to carry arms in his necessary defense. This was not necessary nor in any way called for. The court, as above stated, did not charge on provoking the difficulty, nor in any other way by his charge curtail appellant's right of self-defense, either generally or because of threats, but in the broadest and most comprehensive sense embraced both of these subjects completely and aptly in appellant's favor. Appellant seems to confuse when such charge ought to be given. If the court had charged on provoking the difficulty by appellant, or had otherwise restricted or limited his complete right of self-defense, then perhaps such charge should have been given. It has repeatedly and expressly been held by this court, that it is only necessary or proper to give such

charge when the court charges on provoking the difficulty, or otherwise limits appellant's complete right of self-defense. Williford v. State, 38 Texas Crim. Rep., 393; Fox v. State, 71 Texas Crim. Rep., 318, 158 S. W. Rep., 1141.

Again appellant claims that the court ought to have told the jury that the appellant was not bound to take some other road to town, or diverge from his usual course in order to avoid meeting the deceased. The testimony in this case does not raise any such issue. The State never even asked appellant anything about it, either directly or indirectly, nor did the State in any way contend, so far as this record shows, that appellant ought not to have gone this road to town but some other, but it was conceded by all of the State's testimony, where the subject was mentioned at all, that this was the road to town, the one usually traveled not only by appellant but by everybody else in that neighborhood. Some time after the killing the appellant had a surveyor to go out on the ground and measure the distances and tell about the timber intervening between appellant's house and where he killed the deceased. Not a word of this testimony indicates that there was any other road that he should, or could, have traveled, other than the one he was traveling, in going to town. All this testimony was introduced for the purpose of attempting to show that Mrs. Head, one of the State's witnesses, could not have seen the deceased, nor his team at the time nor immediately after the shooting, because of the obstructions from appellant's house to where deceased was killed, for the purpose of disputing her on the point when she testified what she saw of the parties at the time and immediately after the killing. There was much testimony on this subject, and by experiments from both points by various witnesses,—some placing themselves at appellant's house and gate, and others where the deceased's body fell, and looking from one to the other, some testifying that she could have seen, others that she could not. None of this testimony was introduced or remotely used for the purpose of showing that appellant ought to have taken some other route to town instead of the one he did.

Appellant requested and the court refused to give the fourth special charge. Omitting the formal parts, it is: "In connection with the law of self-defense you are further instructed: That if you find and believe from the evidence in this case, that Will Griffin, the deceased, threatened to take the life of the defendant, Bun Carey, or to do him some serious bodily harm, and that said threats were communicated to him prior to the killing, or that deceased at the time of the homicide threatened to take the life of the defendant, and at the time of the homicide, the deceased, by words or acts, or gestures, or any overt act, manifested an intention to execute said threat and viewed from the standpoint of the defendant alone, it produced in the defendant's mind a reasonable expectation of death or serious bodily injury, or if you have a reasonable doubt thereof, you should acquit the defendant, and this you should do, although you may believe at the time, that said threats were untrue and that Will Griffin did not intend to kill the defendant, Bun Carey. In

this connection you are further instructed, that it is immaterial whether any threats were made prior to the homicide or that said threats were true, it is only necessary to defendant's right of self-defense, that he had been told that deceased had threatened his life or to do him some serious bodily harm, and that the deceased at the time manifested an intention by words, acts, or conduct, to execute said threats, viewed from the standpoint of the defendant alone, sufficient to raise in the defendant's mind a reasonable expectation of death or serious bodily harm, and if so, defendant had the right to kill the deceased, and if you so believe from the evidence, or have a reasonable doubt thereof, you should acquit the defendant and say by your verdict not guilty."

In connection with the refusal of the court to give this charge, appellant again criticises the court's charge on the subject of threats above copied, basing his complaint largely, if not wholly, in this court, on two grounds,—first, that it required the jury to believe that the threats relied on had been *actually* made; second, that the court's charge required the jury to believe that the deceased had threatened appellant's life, *and* had also threatened to do him serious bodily injury. Whereas, he claims that if deceased made the threats to do either, he was entitled to act with reference thereto.

It will be noted in the court's charge above copied, that in paragraphs 30 and 31, where the statute uses, and the court should have used, the word "execute," the court, by inadvertence, used the word "excuse." As to this, the court explains, that the use of the word "excuse" in his charge was an error of the typewriter, not detected by him, nor by the attorneys on either side, and evidently not by the jury, and he says that before the argument of the case he gave his charge to appellant's attorneys and they each, in reading it to the jury, read the word "excuse" "execute" and discussed the case on that theory and that alone as to this word, and that he, when he read his charge to the jury, read the word therein as "execute" and not "excuse." We think, under the circumstances, no possible injury could occur or did occur by the use of this word therein, taking the context and the circumstances into consideration.

Now as to the question of the court's charge requiring that the threats were actually made and the charge requiring the jury to believe that deceased made threats both to take appellant's life and also threatened to do him bodily injury. It is now elementary and well established in this State, both by statute and a large number of decisions of this court, that this court is not authorized,—in fact, by statute expressly forbidden (C. C. P., art. 743, as before the recent amendment thereof), to reverse any judgment of the lower court "unless the error appearing from the record was calculated to injure the rights of the defendant." It is unnecessary to cite the many cases.

The evidence in this case, without contradiction and without contest by the State, clearly shows that deceased did make certain threats against

appellant and that he had absolute notice and knowledge thereof before the killing.

Mr. Talbert, appellant's witness, testified that on February 22nd, before the killing on March 17th following, he was present when deceased and appellant were together and deceased said, "Carey, I can whip you." Appellant replied, "Yes, I guess you could, Will." Appellant himself testified to substantially, if not precisely the same thing, he stating that deceased said, " 'Carey, I can lick you,' and I said, 'I know it, Will,' and laughed at him and went on cutting posts and five minutes afterwards, I reckon, he came back by and never said anything to me."

Appellant's witness, Wideman, testified that on Sunday, three weeks before the killing on Monday, he and appellant were together in appellant's oat field when deceased came to them; that after some controversy between them about their trouble, deceased said to appellant, that because he had forbidden him to come on his land he could kill appellant and the law wouldn't hurt him, and in the same conversation at the time attempted with a rock to kill appellant but was prevented by him, the witness, and that when they separated deceased told appellant in substance that he, deceased, was going to kill appellant and that his folks would find him hung by his toes. Appellant himself testified to substantially the same thing as to what occurred on this occasion, as did his witness Wideman.

Appellant's witness, Mr. Stutts, testified that on Sunday night February 22nd, after the altercation in appellant's oat field, testified to by him and his witness, Wideman, that deceased and his wife were at the house of witness and that he told him about said altercation and that Carey was a grand rascal and he wasn't going to be run over by him and that he was "too damn little" to run over him and that he was going to take as much hide off of appellant's head as he (appellant) had taken ground off of his (deceased's) rows. Mrs. Stutts testified that on the same Sunday evening when deceased was at her home, she heard him state that he didn't like Bun Carey and aimed to have a settlement with him in some way, and that she (Mrs. Stutts) told Mrs. Carey about this.

Elmo Head, appellant's witness, testified that on Saturday evening two weeks before the killing Monday, deceased told him that if Carey plowed any more of his ground that he was going to take as much skin off of his head as Carey took off of his land, and he said he could whip Carey and would do it; and that deceased further told him that Carey was going to keep on mussing with him till he whipped him and that he would get him yet. Head testified that he told Mrs. Carey of this before the homicide. Mrs. Carey testified that Head told her husband of this and she also told her husband before the homicide that Mrs. Head had told her all these same things and that she had told her husband thereof.

This is substantially all the testimony on the subject and, as said above, it establishes without question and without controversy, that whatever threats to kill or to do any bodily injury to appellant by deceased, were known to him before the homicide. There is no indication in the

record, from the whole statement of facts, that any of these threats or the communication of them to appellant was contested by the State or disputed by it in any way, but it seems clearly to have been conceded by the State that said threats had been made and appellant knew of them,—in fact, most of them made to him personally in the presence of others, and those not so made had been communicated to him. So that the court's charge, on none of the grounds on which it is attacked by appellant, presents any reversible error. Appellant was not and could not have been injured thereby, even if the court did, by his charge, in effect, tell the jury they must believe the threats were actually made, and that threats, both to kill and do serious injury, were made. The court's charge fully, aptly and completely presented every issue on these subjects as favorably to appellant as the evidence authorized.

It is unnecessary to discuss any of appellant's other special charges which were refused by the court, or any other criticism of the court's charge. None of them present any reversible error.

Appellant's bill, as qualified by the court, shows no error in excluding the testimony of Mrs. Stutts as to what her husband told her. And, as qualified by the court, appellant's bills to the testimony of Mrs. Head shows no error,—all her testimony was admissible.

There being no reversible error shown, the judgment will be affirmed.

*Affirmed.*

[Rehearing denied May 27, 1914.—Reporter.]

DAVIDSON, JUDGE (dissenting).—Appellant was convicted of murder in the second degree, his punishment being assessed at ten years confinement in the penitentiary, which is five years in excess of the minimum punishment fixed by the Legislature for that degree of murder.

I deem it unnecessary to enter into a general statement of the facts as this has been sufficiently done perhaps in the opinion of the majority so far as the questions I purpose to discuss are concerned.

I can not agree altogether with my brethren, as to that part of the statement in the opinion which refers to the two roads that lead from appellant's residence to town. Quoting from the majority opinion I find this: "Again appellant claims that the court ought to have told the jury that the appellant was not bound to take some other road to town, or diverge from his usual course in order to avoid meeting the deceased. The testimony in this case does not raise any such issue. The State never even asked appellant anything about it, either directly or indirectly, nor did the State in any way contend, so far as this record shows, that appellant ought not to have gone this road to town but some other, but it was conceded by all of the State's testimony, where the subject was mentioned at all, that this was the road to town, the one usually traveled not only by appellant but by everybody else in that neighborhood. Sometime after the killing the appellant had a surveyor to go out on the ground and measure the distances and tell about the timber intervening between appellant's house and where he killed the deceased. Not a

word of this testimony indicates that there was any other road that he should or could have traveled other than the one he was traveling, in going to town. All this testimony was introduced for the purpose of attempting to show that Mrs. Head, one of the State's witnesses, could not have seen the deceased, nor his team at the time nor immediately after the shooting because of the obstructions from appellant's house to where deceased was killed, for the purpose of disputing her on the point when she testified what she saw of the parties at the time and immediately after the killing." So far as whether the State or the defendant put in the testimony as to the different routes would make no difference so far as its effect upon the jury is concerned. If there were two roads from appellant's house to town and he traveled them indiscriminately, or if he traveled the road usually that he did not travel the day of the killing it might and did become an important issue and evidently was the subject of serious discussion before the jury that the defendant selected the particular road for this occasion in order that he might meet the deceased and bring on this difficulty and produce this tragedy, when by going the road he also traveled it could have been avoided. Mrs. Head testifies as follows: "It was when he first come up that he wanted the shells and said he was going back where Will Griffin was. But he went around the other road then. When he got on his horse, he didn't go back to where Will Griffin was, but went the other way." Now under this testimony of Mrs. Head when appellant returned home after the killing of Griffin and got the shells, he left traveling the other road; and she further testified: "He saddled his horse, got the cartridges and came around by old man Lucas', a different route to what he usually comes to town. The road I usually travel in coming to town is the one by Carey's house, by Griffin's house. That is the road Bun (appellant) and all of us people travel in coming to town. That is the nearest and customary route to town, *but Bun had been going the other way.* (Italics mine.) The road that I speak of runs through Bun's field and through Mr. Griffin's field, his cotton patch and corn patch, and crosses the creek. That road runs up by Mr. Lucas' house and by our house and makes an angle by my house and out by Rayburn Hill's. When we come to town we come down there, and before we get to Mr. Lucas' we make a turn and come by Bun Carey's and Mr. Griffin's. Sometimes Bun leaves his house and comes south along the same road. He don't go that way all the time. That is the nearest route for Bun to come. I don't know how much sand there is around by Mr. Lucas'." Mr. Lucas testifies as follows in reference to appellant using another road: "That is the only statement he made to me about it that I remember of, and he struck off in a gallop. He went the road toward Mr. Smith's. Mr. Smith lived right east of me."

Now, as I understand this testimony it shows that when appellant galloped away from this conversation with Lucas going east towards Smith's house, it demonstrates that he came to town on the road which Mrs. Head said he sometimes traveled prior to the time of the homicide.

But be that as it may, this testimony shows clearly that there were two roads, and Mrs. Head testifies that he traveled these different roads, and this, as I understand, is the only legitimate conclusion to be deduced from her testimony. I have made this statement in view of what the majority opinion says and the conclusion reached in that opinion. The majority opinion seems to be based upon the idea that in order to raise the question brought out by appellant and urged for reversal, it was necessary for the State to emphasize these facts about the two roads. Mrs. Head was a State witness. It would make no difference how it got before the jury if the evidence was before the jury and it was used against appellant, that he traveled the road that led by where deceased was instead of going the other road. The effect used in argument or deduction from these facts would be equally detrimental. If it was urged before the jury, as it unquestionably was, that appellant instead of going the other road had taken the road by the deceased, it could be detrimentally used against appellant and the jury might and could infer that he went the road by the deceased's for the purpose of bringing on the difficulty, especially when viewed in the light of the fact that he did kill him. If he had gone the other road the killing would not have occurred.

Without going further into this phase, this brings us to the special charge asked by appellant and refused by the court, in the following language: "The party whose person is unlawfully attacked is not bound to retreat in order to avoid the necessity of killing his assailant. Therefore you are instructed that if you believe from the evidence in this case, that the defendant Bun Carey knew that the deceased Will Griffin was working in his field by the side of the public road which Carey usually traveled in coming to Stephenville, and Carey was traveling said road on his way to Stephenville at the time of the homicide, defendant was not bound to take some other road to town or diverge from his course in order to avoid a meeting with the deceased, and the defendant had the further right to arm himself to protect his life against any former or expected attack upon him by the deceased, and to carry said arms whenever and wherever he believed his life to be in danger, and was not bound to retreat in any manner, and the fact that he did so, would not in any manner militate against, alter, or abridge his right of self-defense if he acted upon the reasonable appearances of danger or serious bodily injury, or death, either one or both, at the time of the homicide." Now, the court gave the following charge with reference to retreat: "A party whose person is unlawfully attacked is not bound to retreat in any event in order to avoid the necessity of killing his assailant." There was no application, however, of this proposition directly to the facts, but it was given in the abstract. There was no charge given by the court, either directly or indirectly, as to the right of appellant, in view of the threats proved against him, to carry arms for his self-defense. Nor does the charge anywhere instruct the jury that appellant was not bound to take some other road in traveling to town, or that he was not compelled to

diverge from his course in order that a meeting with the deceased might be avoided. Nor did the court applying the law of retreat charge the jury that his failure to retreat would in no manner abridge his right of self-defense under the circumstances here stated. The law is that retreat is a part of the right of self-defense, and it has always been held reversible error not to charge it, where the facts in the case required such an instruction. This matter was discussed in Arto v. State, 19 Texas Crim. App., 126. I am of the opinion that appellant traveling this particular road on this particular occasion and the homicide resulted while going down the road, and the contention of the State that he went down this road for that purpose, required the charge requested or a similar one. In this connection it is further contended, and I think correctly, that the court should have instructed the jury that if appellant, knowing that the deceased was there, started to go to town and did go to town on that road, that he had a right to do so if he saw proper, and anticipating trouble with deceased he further had a right to arm himself in anticipation of the execution of the threats made against his life or against his body by the deceased. Our law lays down a correct rule that wherever threats have been made by deceased against the accused that the accused has a right to arm himself and call on the other party, his adversary, for an explanation, and if the other party becomes the attacking party, under such circumstances the law of self-defense, or his right to defend himself, will not be compromised or abridged. The decisions on this question in this State are uniform and especially so since Shannon v. State, 35 Texas Crim. Rep., 2. Even had the appellant armed himself and gone to where his adversary was and asked of him an explanation, and deceased had then made an attack upon him, his right of self-defense would not be in any way compromised. Of course, if appellant did any act or said any words to provoke a difficulty and did provoke it in order that he might kill, the law of self-defense would be compromised under the rule of provoking a difficulty, but the court should have submitted appellant's theory to the jury in the connection requested by appellant so that the jury might not be misled to using the evidence against him that he traveled the road that he did travel, which carried him by deceased's house, armed as he was, when he might have or could have traveled some other road.

Appellant requested another charge, which was refused. It is as follows: "In connection with the law of self-defense you are further instructed: That if you find and believe from the evidence in this case that Will Griffin, the deceased, threatened to take the life of the defendant, Bun Carey, or to do him some serious bodily harm, and that said threats were communicated to him prior to the killing, or that deceased at the time of the homicide threatened to take the life of the defendant, and at the time of the homicide the deceased, by words or acts, or gestures, or any overt act, manifested an intention to execute said threat and viewed from the standpoint of the defendant alone, it produced in the defendant's mind a reasonable expectation of death or

serious bodily injury, or if you have a reasonable doubt thereof, you should acquit the defendant, and this you should do, although you may believe at the time that said threats were untrue and that Will Griffin did not intend to kill the defendant Bun Carey. In this connection you are further instructed that it is immaterial whether any threats were made prior to the homicide or that said threats were true, it is only necessary to defendant's right of self-defense, that he had been told that deceased had threatened his life or to do him some serious bodily harm, and that the deceased at the time manifested an intention by words, acts or conduct to execute said threats, viewed from the standpoint of the defendant alone, sufficient to raise in the defendant's mind a reasonable expectation of death or serious bodily harm, and if so, defendant had the right to kill the deceased, and if you so believe from the evidence, or have a reasonable doubt thereof, you should acquit the defendant and say by your verdict not guilty." This requested charge was refused, and is properly presented for revision, and an exception was taken to the following charge given by the court: "Where the defendant, accused of murder, seeks to justify himself on the ground of threats against his life, he may be permitted to introduce evidence of the threats made, but the same shall not be regarded as affording a justification for the offense, unless it be shown that at the time of the homicide the person killed, by some act then done, manifested an intention to *excuse* the threats so made." The other paragraph of the court's charge in this connection, and to which an exception was also reserved, is as follows: "Now if you believe from the evidence in this case that prior to the homicide the deceased had made threats against the life of the defendant, *and* to inflict serious bodily injury on defendant, and that at the time of the homicide the deceased, by some act then done, manifested an intention to *excuse* the threats so made, or if you have a reasonable doubt as to whether or not he did, then you will give the defendant the benefit of such doubt and acquit him." I do not purpose to enter into a discussion of the error in the court's charge wherein he uses the word "excuse" in place of "execute." There is fatal error, however, in that portion of the charge which coupled the threats to kill *and* to inflict serious bodily injury. The law of self-defense justifies if the party threatened to kill, *or* inflict serious bodily injury. The law of justifiable homicide from this viewpoint would be as perfect against one as the other. It is not requisite under the law of self-defense that the purpose to kill *and* to inflict serious bodily injury should combine or concur. If either existed appellant would have the right to defend under the law of justifiable homicide. If the deceased did not utter the threats to kill *but only to inflict serious bodily injury,* this error would be intensified, because the court was requiring the jury in that event to believe that the threat was uttered to take the life or to kill, when, as a matter of fact, it was not uttered under this theory, but only to inflict injury. Therefore, the jury was required from that standpoint to believe things not proved in order to authorize an acquittal. In other words, if those threats were not

made to kill, but the threat was *only* to inflict serious bodily injury, the court required the jury to believe two things, either of which would justify, when the facts would only show one threat, or a threat to do one thing. A party has equal right to defend himself against threats to inflict serious bodily injury as he has against threats to take his life. It is not necessary that the two combine, and in this particular case it is not clear that the threats were to kill, but it is clear that the threats were to inflict serious bodily injury. However, I think the evidence would justify and require the court to charge both theories. If both characters of threats were made, or if there was a doubt about that fact, the court should have instructed as the statute requires and as our law demands, that if threats to kill *or* to inflict serious bodily injury, or either were made, the law of self-defense would be complete and perfect so far as that phase of the case is concerned. The charge requested by appellant may not have been as artistically drawn as it should have been, yet it called the court's attention to the law applicable to the case, and that the charge given by the court was not the law. So under any view of the case the court's charge was reversible error. It deprived the defendant of a substantial right guaranteed to him by the law of the land. He was entitled to the law as enunciated by the statute and our jurisprudence, and the court's charge coupled his right of self-defense with propositions too onerous and not justified or authorized by our law.

Without going further into the case I state the above as some of the reasons why I believe this judgment should not be affirmed, but that it should be reversed and remanded that the appellant may have a trial under the law as it has been fully enunciated heretofore by both the statute and the decisions.