## WILL CHANT v. THE STATE.

### No. 2903.   Decided April 8, 1914.

### Rehearing denied May 6, 1914.

**1.—Murder—Special Term of District Court.**

The district judge has authority to call a special term of the District Court and arraign and try persons accused of crime at said special term. Following Ex Parte Young, 49 Texas Crim. Rep., 536, and other cases.

**2.—Same—Self-serving Evidence.**

The court did not err in sustaining an objection as to defendant's declaration as to what took place long after the difficulty and under such circumstances as not to come within the rule governing res gestae statements: besides, the bill of exceptions was defective, and this character of testimony was afterwards admitted.

**3.—Same—Misconduct of Jury—Impeaching Verdict.**

Jurors are not permitted to impeach their verdict by testifying that they in fact believed defendant's theory of the case, but agreed to the verdict of guilty in an effort to compromise, etc.

**4.—Same—Express and Implied Malice—Charge of Court.**

Where defendant was convicted of murder on implied malice, an objection to the charge of the court submitting murder upon express malice need not be considered.

**5.—Same—Manslaughter—Charge of Court—Negligent Homicide.**

Where, upon trial of murder, the State's evidence raised the issue of implied malice and the evidence for the defense, accidental homicide and the testimony as a whole, also raised the issue of negligent homicide, all of which the court submitted to the jury, and under no theory was the question of intentional shooting under the influence of sudden passion, etc., produced by an adequate cause raised by the evidence, there was no error in the court's failure to charge on manslaughter; besides, the objections to the court's charge were too general.

**6.—Same—Conspiracy—Charge of Court.**

Where, upon trial of murder, the evidence showed that defendant and another engaged in an unlawful purpose of doing an unlawful act during which the deceased was killed, there was no error in the court's charge submitting the law of conspiracy, the court also submitting the converse of the proposition under defendant's evidence that he in nowise aided or encouraged the other in the unlawful mission and that the killing was purely accidental.

**7.—Same—Misconduct of Jury—Separation.**

Where, upon trial of murder, it appeared from the record on appeal that one of the jurors became ill during the trial and was waited upon by a physician and his aunt in the presence of an officer and nothing improper occurred and that he, in fact, was not separated from the other jurors, there was no reversible error.

Appeal from the District Court of Edwards. Tried below before the Hon. R. H. Burney.

Appeal from a conviction of murder; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*Will A. Morriss* and *Cornell & Wardlaw*, for appellant.

*C. E. Lane*, Assistant Attorney General, for the State.

HARPER, Judge.—Appellant was indicted, charged with the murder of Mary Connell, at the regular June term of the District Court of Edwards County, 1913. Thereafter on July 13th, Hon. R. H. Burney, judge of said court, called a special term of the District Court of Edwards County to convene on August 11, 1913, for the trial and disposition of this and four other cases named in the order convening court, giving notice, etc., complying in every detail with the law authorizing special terms of the District Court to be held. (Chapter 4, title 34, Rev. Stats.)

Appellant contends that the District Court had no authority to call a special term of the District Court, and that the arraignment and trial of him at this special term was unauthorized and void. This question has been passed on so often adversely to appellant's contention we deem it unnecessary to discuss it again. Ex parte Young, 49 Texas Crim. Rep., 536; Ex parte Boyd, 50 Texas Crim. Rep., 309; McIntosh v. State, 56 Texas Crim. Rep., 134; Boyd v. United States, 209 U. S., 539.

Appellant, after he had shot and killed Mrs. Connell, intentionally as contended by the State, or accidentally as contended by him, left the

place where the killing occurred, and later in the night went to the home of Frank Kelly and called Mr. Miller, justice of the peace, over the phone, and talked to him, and he desired to prove by witnesses what he then said to the justice of the peace about the homicide, which testimony was objected to by the State on the ground that it was self-serving and not res gestae of the transaction. The court did not err in sustaining the objection, for it would have been but a self-serving declaration, and took place so long after the difficulty and under such circumstances as not to come within the rule governing res gestae statements; in fact, appellant does not contend that it does, and neither in the bill nor in the brief does he state upon what grounds he believed the testimony should be admitted, he merely stating that he excepted to the ruling of the court in sustaining the objection of the State. For the same reasons the statement made to Frank Kelly at the same time and place would not be admissible. However, in the record it appears that later the court did permit Mr. Kelly to testify what appellant told him on that occasion.

The only other two bills of exception in the record relate to the refusal of the court, on hearing of the motion for a new trial, to permit jurors Clark and Crausbay to testify that they in fact believed appellant's theory of the case, and that they agreed and consented to the verdict rendered, and yielded their judgment in an effort to compromise and agree with the remainder of the jury. A juror is not permitted thus to impeach his verdict after it has been rendered and accepted by the court, and the jury discharged.

As appellant was convicted of murder upon implied malice, or, as formerly defined, murder in the second degree, we will not notice those portions of the motion for new trial and objections to the charge relating solely to those parts of the charge defining and submitting murder upon express malice, or murder in the first degree. The evidence in this case did not call for a charge on manslaughter. The facts would show that Will Connell, a son of deceased, eloped with and married Ruby Wilson, a daughter of Mrs. Mollie Wilson. After the marriage Mrs. Wilson, in some way, secured possession of her daughter and carried her to San Antonio. Will Connell's father went to San Antonio and Ruby returned with him, and she and Will Connell resumed their relations as husband and wife. When the District Court of Edwards County convened some weeks later, Mrs. Wilson accompanied by her brother, appellant, Will Chant, went to the county seat and sought the district attorney in an effort to have Will Connell indicted for swearing falsely to obtain marriage license. She was informed by the district attorney that the grand jury would not indict Will Connell, and that if they did, under the evidence, so far as he knew, he could not obtain a conviction, and he says he advised her to let the matter drop. She asked if the marriage could not be annulled, and he declined to advise her, and referred her to other attorneys. The only difference in the testimony for the State and defendant up to this point is that the defendant claims that the district attorney told Mrs. Wilson the marriage could be annulled. But be this

as it may, no proceedings were instituted to annul the marriage, and no other attorney visited by Mrs. Wilson that day, but she and her brother, appellant, left the county seat to return to their home. After getting to the house of appellant, he got out, and Mrs. Wilson went over to her home. Sometime later appellant leaves his home, goes by the residence of his half brother, Luther Roberts, and borrows a Winchester rifle and a box of cartridges, and then goes to the home of Mrs. Wilson. The State's testimony shows that later in the night, after the Connell family had retired and was asleep, Mrs. Wilson appeared in the room in which Will Connell and his wife Ruby were sleeping, with a shotgun loaded with buckshot. The noise she made awoke Will Connell, who sprang out of the bed and grabbed the gun by its barrels, and he and Mrs. Wilson began a scuffle for the possession of the gun, when Mrs. Connell called, "Will, come here." Mrs. Mary Connell and her daughter, Allie, had been awakened by this time, and as appellant came runing to the door, he was met by Mrs. Mary Connell, Mrs. Ruby Connell and Miss Allie Connell, who would not let him enter the house, and told him that Will Connell was not going to hurt Mollie. That appellant, Will Chant, then caught hold of Mrs. Mary Connell, jerked her out of the door, and off the gallery, and then shot her. We do not deem it necessary to go into further details. Appellant admits that that he went to the home of Mrs. Wilson that night, and went by Luther Roberts and got his gun; however, he says that Mrs. Wilson was moving to his home, and he went there to get the remainder of the chickens, and as they were wild he got the gun and carried it to kill the chickens as some of them were wild. That he knew nothing of Mrs. Connell's intention to go to the Connell home that night until he arrived at her home, when he tried to dissuade her from going that night, but she insisted on going, and he thought it his duty to go with her; that on the way to the Connell home he again tried to get her to wait until the next day when he would go with her in an effort to get Ruby to return to her mother, but Mrs. Wilson would not consent, saying if she could get her hands on Ruby she would come. They went to the Connell house, and he stopped a piece from the house, his sister going on in the house. He then heard her call, "Will, O Will, come here, they are killing me," and he ran to the house, where he was met by Mrs. Mary Connell, Ruby and Allie, and Mrs. Mary Connell pushed him back out of the house and off the gallery, and as she did so he stepped on something that caused him to stagger, when the gun was accidentally discharged. However, on cross-examination, he admitted that after this shot, he fired intentionally a second time at what he took to be a fleeing person. It is thus seen that the State's evidence would make a plain case of Mrs. Wilson and appellant arming themselves, and in the dead hours of night visiting the home of the Connells, with the intention of by force taking the wife of Will Connell away from him; that while Mrs. Wilson went in the house, he stopped outside to watch, and when she called he rushed in to take part in the unlawful mission, and being denied admittance he jerked the older

of the ladies, Mrs. Connell, out of the door and killed her, and as the Connells fled he took a shot at what he thought was one of the fleeing Connells, and if this state of facts is found by the jury to be true, it presents the issue of murder and murder alone. Appellant's contention is that he went unwillingly, trying to dissuade his sister, and stopped outside not to watch but only to wait until his sister performed her mission, and then escort her and Ruby home, if she succeeded in getting Ruby, and he only went to the house in answer to her call; that the kill-. ing was purely accidental, and the gun discharged by him stumbling when pushed back by Mrs. Mary Connell. This evidence presents accidental homicide, and the testimony as a whole also presents the issue of negligent homicide, both of which were admitted by the the court to the jury, and under no theory is the question of intentional shooting under the influence of sudden passion, etc., produced by an adequate cause, presented, therefore, the court did not err in failing to charge on manslaughter. No special charge was asked in regard to this matter, and the only way it is raised is in the general way, "the court erred in failing and refusing to submit to the jury the law of manslaughter." This has been held to be too general to bring the question before us for review, however, as hereinbefore shown, we have fully considered it and hold that the court did not err in so doing.

The main complaints as to the charge are directed at the following paragraphs: "You are instructed that by the term 'conspiracy' as hereinafter used in these charges is meant a combination and agreement between two or more persons to commit a crime or to do some other unlawful act, the furtherance and carrying out of which will reasonably and probably result in the commission of an offense, and all parties uniting, or acquiescing in such agreement and combination are conspirators, and each party to any such conspiracy is responsible in law for the acts of his co-conspirators, or for any offense which may be committed by any party thereat in the furtherance of a common design or purpose of the conspiracy, or that which is necessarily incident to and grows out of such common design, and follows as one of its natural and probable consequences, a conspiracy may be established by either direct or circumstantial evidence, or both and it is not necessary in order to warrant a finding that a conspiracy existed for the State to show that parties thereto ever actually in fact entered into a formal agreement to commit the unlawful act, it is sufficient if the evidence satisfactorily shows the performance of different acts and parts of a co-design to acquiesce in and done in the furtherance thereof." It is contended that the evidence does not authorize a charge on conspiracy to commit an unlawful act. We do not think anyone can contend that the act admitted and shown to have been the object of this night visit to the Connells was not an unlawful one—the object was to by stealth or force take the wife of Will Connell, Ruby, away from him. They had that day visited the county seat for the purpose of attempting to send Will Connell to the penitentiary and thus separate them, and failing in this, if for any

reason the marriage could have been annulled, instead of taking legal steps to do so, the evidence would at least circumstantially show that they determined to take the law into their own hands, and by stealth or force take Connell's wife away from him, and the dark hours of night selected to accomplish this purpose. While appellant would by his testimony show an innocent participation therein, yet the facts and circumstances introduced by the State would authorize a jury to find that his explanation of his acts on this occasion is an afterthought. It was necessary to give this definition that the court's charge on negligent homicide could be intelligently understood by the jury, and this charge, too, the court properly submitted, and appellant's contention that no such issue was raised can not be sustained. Even if the gun was accidentally discharged, if he and his sister were engaged in the unlawful mission of trying to take Connell's wife away from the home of her husband by stealth or force, one being armed with a rifle and the other with a shotgun loaded with buckshot, and in the furtherance of that unlawful purpose, while he was trying to force himself in the house, his gun was accidentally discharged, this would bring the case within the purview of chapter 14, title 15 of the Penal Code, defining negligent homicide of the second degree. If the court had not submitted that issue, appellant would have just cause of complaint, for he would then have contended, that as the facts showed he was accompanying his sister on an unlawful mission, the jury would not likely be willing to relieve from all punishment the person who had taken the life of a woman against whom neither of them had cause for complaint, and the court ought to have given them an opportunity to assess against him this minor punishment.

As to appellant's contention that he in nowise aided or encouraged his sister in this unlawful mission, and that the killing was purely accidental, while he was guilty of committing no unlawful act nor attempting to do so, the court fully and fairly submitted that theory of the case to the jury, and they find against him. The court instructed the jury:

"Homicide is excusable under the law when the death of a human being happens by accident, though caused by the act of another who is in the prosecution of a lawful object by lawful means. If, therefore, you find from the evidence that on or about the time alleged in the indictment, in Edwards County, Texas, one Mollie Wilson, for the purpose of taking her daughter Ruby Connell, away from her husband, Will Connell, went to the house where the said Will Connell was living, and you further find that the defendant Will Chant followed her to the said premises for the purpose of trying to persuade her, the said Mollie Wilson, not to attempt to take the said Ruby Connell, or even if you find that the said Mollie Wilson went there for the purpose of killing Will Connell, but that the defendant did not enter into any agreement to assist her in any such unlawful purpose, but merely followed her for the purpose of trying to persuade her to desist from any such unlawful purposes, if any, and that failing in this, he stopped outside of the premises where the said Will Connell and his wife were staying and that

thereupon the said Mollie Wilson went into the house where the said Will Connell and his wife were staying, and thereupon a struggle ensued between the said Mollie Wilson and said Will Connell over a gun, which the said Mollie Wilson was armed with, if any, and while engaged in said struggle over the possession of the said gun, if any, between the said Mollie Wilson and the said Will Connell or others, the said Mollie Wilson called to the defendant to come to her assistance, and that thereupon the defendant rushed to the scene where the struggle was taking place, and that after reaching there and while attempting to go to where the said Mollie Wilson was, the defendant unintentionally and accidentally discharged his gun and shot and killed the said Mary Connell, then in case you so find the facts to be, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict not guilty." Not only did they find against him on this contention made by him, but they find evidently, knowing the unlawful mission of Mrs. Wilson, he aided and abetted her therein, and that while the killing of Mrs. Mary Connell was not a part of the mission, yet in an attempt to take Mrs. Ruby Connell away from her home appellant intentionally killed Mrs. Mary Connell, for they find him guilty of murder and assess his punishment at ten years confinement in the penitentiary, and the evidence offered by the State supports such a finding. The other criticisms we do not deem it necessary to discuss.

During the trial juryman Crausbay became sick, and at night a physician was called, who prescribed for him in the presence of an officer. The next morning he was too unwell to proceed with the trial, and he was laid on a cot in the courtroom, while the other jurymen were in the jury room. This was agreed to by appellant's counsel. While he was lying on the cot his aunt, Mrs. Winn, in the presence of the court and sheriff, approached the cot, inquired as to his condition, and offered to prepare him something to eat. Later Miss Winn returned with a bowl of soup and gave it to him in the presence of the officer staying with him. Appellant in his motion for new trial complains of all these matters, and the court heard evidence thereon. We have read this testimony, and hold, as did the trial court, that nothing improper occurred, and that this was not such a separation of the jury as would authorize a reversal of the case. In the afternoon the juryman was able to proceed with the trial, and it is not asserted nor contended by appellant this influenced his action as a juryman, or that anything improper was said, and the evidence, and all the evidence shows that not to be the facts.

The judgment is affirmed.

*Affirmed.*

[Rehearing denied May 6, 1914.—Reporter.]