## O. R. DAVIS V. THE STATE.

### No. 4648. Decided January 30, 1918.

### Rehearing denied June 12, 1918.

**1.—Murder—Indictment—Special Term of District Court.**

The contention that the indictment was found at a special term of the District Court, without giving thirty days' notice prior to the time the court was held, is untenable. Following Mayhew v. State, 69 Texas Crim. Rep., 187, and other cases.

**2.—Sufficiency of the Evidence.**

Where, upon trial of murder and conviction thereof, the evidence sustained the same under a proper charge of the court, there was no reversible error.

**3.—Same—Evidence—Res Gestae.**

Where, upon trial of murder, the evidence showed that immediately after defendant had cut and stabbed deceased, the latter went directly to his store and died there within a very few minutes; that as soon as he reached there his wife testified he told her, "Oh! Mother, he has got me this time. He was to blame. He jumped on me." Held, that the same was res gestae and admissible as a shorthand rendering of the facts. Following Clark v. State, 56 Texas Crim. Rep., 293, and other cases.

**4.—Same—Declarations of Deceased—Res Gestae—Bill of Exceptions.**

There can be no doubt that the statement of deceased to the effect that "Oh, Mother. he has got me this time. He jumped on me," was admissible, and the other "He was to blame," not being separately objected to, there was no reversible error. Following Ortiz v. State, 68 Texas Crim. Rep., 524, and other cases. Besides the same character of testimony was admitted without any objection. Following Wagner v. State, 53 Texas Crim. Rep., 306, and other cases.

**5.—Same—Self-defense—Charge of Court.**

Where, upon trial of murder and a conviction of said offense, the court's charge on self-defense, although in some respects defective, was cured by the requested charge, there was no reversible error. Besides there were no objections to the court's charge.

**6.—Same—Right of Going Armed—Charge of Court.**

Where no charge on provoking the difficulty is given, there was no error in the court's failure to submit a requested charge on the subject of defendant's right to arm himself in preparation of a contemplated attack. Following Carey v. State, 74 Texas Crim. Rep., 112, and other cases.

Appeal from the District Court of Panola. Tried below before the Hon. Daniel Walker.

Appeal from a conviction of murder; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*J. G. Woolworth, H. N. Nelson, J. R. Duran,* and *Jas. M. Edwards,* for appellant.—On questions of declarations of deceased: Sorrell v. State, 74 Texas Crim. Rep., 505, 169 S. W. Rep., 299; Drake v. State, 65 Texas Crim. Rep., 282, 143 S. W. Rep., 1157; McDoughal v. State, 194 S. W. Rep., 944; Figaroa v. State, 58 Texas Crim. Rep., 611, 127 S. W. Rep., 193; Lockhart v. State, 53 Texas Crim. Rep., 589, 111 S. W. Rep., 1024.

*E. B. Hendricks,* Assistant Attorney General, for the State.

PRENDERGAST, JUDGE.—This is an appeal from a conviction of murder with the lowest punishment assessed.

The indictment is attacked because it was found at a special term of the court called by the judge without giving thirty days notice prior to the time the court was held. The validity of such a term and all proceedings had thereat have been so many times and so uniformly sustained by this court, that it is unnecessary to discuss the question again. Mayhew v. State, 69 Texas Crim. Rep., 187; Vasquez v. State, 76 Texas Crim. Rep., 37; Chant v. State, 73 Texas Crim. Rep., 345, and cases cited; Gillespie v. State, 73 Texas Crim. Rep., 585; Valdez v. State, 71 Texas Crim. Rep., 487; Fisher v. State, 81 Texas Crim. Rep., 568, 197 S. W. Rep., 189.

That appellant killed deceased by stabbing him with a knife is established by the uncontradicted testimony, and not contested by appellant. His sole defense was self-defense.

There were several eyewitnesses to the killing who testified. They varied as to some of the facts as is nearly always the case.

Appellant and deceased were brothers-in-law, deceased having been married to appellant's sister for some seventeen years, they having five children, one a boy about ten years old. Appellant and deceased were merchants in the town of Clayton. Their stores some seventy-five or eighty feet apart on the same side of the street with one other store and small vacant spaces between them.

Some two or three years before the killing, some of the witnesses testified, that appellant had accused deceased of misappropriating some of the school fund of the school of which they both and another were trus-

tees.  Deceased at the time resented this accusation to appellant himself.  Thereafter they continued to pass and repass and had more or less business between them, but it seems deceased never became cordial towards appellant.  The testimony of several witnesses is clearly to the effect that appellant was quite hostile towards deceased and was to the effect that appellant repeatedly made threats against deceased, even to the extent of what could be regarded as a threat to kill him.  Bloomer Reeves testified that he was present when deceased told appellant that he, appellant, had accused deceased of misappropriating said school money and that at the time deceased said to appellant that he had misinterpreted the thing from start to finish and that there was not anything to it, that he could take his books and show where every nickel had been spent that had been turned over to him when he took charge; that appellant replied, "Don't say I have lied; I will separate your head from your body."  And that at that time he was whittling on a stick with his knife.

Pete Giles testified that about a week or ten days before appellant killed deceased he, with others and appellant, were about an automobile in the town of Longbranch, near Clayton; that deceased passed nearby and spoke to witness and perhaps others, not stopping, however.  And that after deceased had passed something was said about him, and appellant said of deceased, "That damned son-of-a-bitch had to leave Clayton, or him, one or the other."  Oscar Reed testified to substantially the same thing of what appellant said at the time, except that he did not hear him use an oath in connection with the remark.  The testimony shows an entire absence of any threat by deceased towards appellant at any time.

Late in the evening, just before appellant killed deceased, the ten-year-old son of deceased was out in the street in front of appellant's store playing in the sand and throwing up sand.  Appellant himself swore that it wasn't specially hurting anything on the inside of the store but that he didn't want him throwing it up any more and told him if he didn't stop throwing it up he would whip him.  He says the boy was like some little boys, a little sassy, and said he was not going to stop it, or as some of the other witnesses said, he replied he did not have to stop it.  However, the boy did stop it and went to his father's store, where his mother was, and told her of the occurrence.  He did not tell his father but told her.  She said that his father then hearing something of it asked her and she told him what the boy had said to her.  She said deceased did not at once go to see appellant about it, but after attending to some other matters for a short time did go over to see appellant.  All of the eyewitnesses, and so did appellant, in substance, testified that appellant was standing on the outer edge of his store gallery; that deceased walked up and stopped several feet from him and asked him what the boy had done and what he had said to the boy.

Amos Holt, one of the eyewitnesses, who was right at the parties at the time, testified that deceased "asked Mr. Davis what his boy was

doing (Carmichael's boy), and Mr. Davis told Mr. Carmichael that the boy was throwing sand up in front of his (Davis') store; Mr. Carmichael asked Mr. Davis what he had said to the boy, and Mr. Davis said that he had told the boy that if he didn't quit he would whip him, and he told Mr. Carmichael that he would whip him (Carmichael), too"; that at the time Mr. Carmichael was some four or five feet from Mr. Davis; that Mr. Davis started off of his gallery onto Mr. Carmichael, putting his hand in his pocket as he went; that Mr. Carmichael caught Mr. Davis when they came together. They slung each other around about twice. Mr. Davis "stuck his knife in Mr. Carmichael and they separated. They went to the ground after Mr. Davis was striking Mr. Carmichael. After they fell to the ground Mr. Carmichael straightened up from over Mr. Davis." In another place this witness swore as follows: "Mr. Carmichael asked Mr. Davis what his boy was doing, and at that time Mr. Carmichael was standing right where he had stopped at first; and Mr. Davis told him that his boy was throwing up sand in front of the store; Mr. Carmichael did not move then, but asked Mr. Davis what he had said to the boy; and Mr. Davis told Mr. Carmichael that he had told the boy that if he didn't quit he would whip him, and also told Mr. Carmichael that he could whip him (Mr. Carmichael), too; to give Mr. Davis' exact language, he said: 'I told him if he didn't quit I would whip him, and, God darned you, I can whip you, too.' At that time Mr. Carmichael was still in the same place. Mr. Davis then started toward Mr. Carmichael, who was something like three or four steps away, and as he started toward him he (Mr. Davis) put his hand in his pocket, and walked pretty pert; and at that time Mr. Carmichael was not doing anything, I saw him at the time. . . . Mr. Carmichael did not advance or move toward Mr. Davis from the point where he first stopped and asked the question. After they caught each other they slung each other around and around. I don't know when Mr. Davis opened his knife, I didn't see him open it; all I saw him do was to put his hand in his pocket and pull it out when he started on him. When Mr. Davis struck Mr. Carmichael they were standing up together, and when he made this lick he hit Mr. Carmichael in the breast, just this way (indicating)." He further swore: "I saw Mr. Davis strike Mr. Carmichael in the front part of the body, and by the front part of the body I mean in here (indicating); I am not mistaken about it and have no doubt about it. I did not see any lick struck after they were on the ground and while Mr. Carmichael was standing over Mr. Davis there was no lick struck there."

Mrs. Carmichael swore that when her husband left their store to go to see appellant he was not mad and did not look to be mad. Mr. Holt swore that he was not mad and did not look angry when he had the conversation with appellant detailed above. Others and appellant himself swore that deceased looked mad at that time, and as they say, was mad.

The proof was that deceased had no arms whatever and eyewitnesses,

including appellant himself, swore that deceased did not strike, nor strike at, nor attempt to strike appellant at any time before or during the difficulty. The different witnesses' detail of the difficulty was to the effect that when appellant ran his hand in his pocket and got out his knife that deceased caught his hands and arms and only tried to prevent appellant from cutting him. The knife with which appellant killed deceased was shown to have a place at the end where it could be easily and quickly opened. Appellant cut deceased twice with the knife. One cut was on the arm just below the shoulder, and severe, being four or five inches long. The other one was a deep stab in the left breast, making a ghastly wound, penetrating the heart.

Mr. Nelson, who was the merchant in the store between that of appellant and deceased, swore that as Mr. Carmichael walked off from appellant towards his store he saw he was bleeding in the breast, and asked him what was the trouble, but Mr. Carmichael made no reply. He swore: "I then turned to Mr. Davis and asked what he meant by cutting a man up and he said, 'The damn son-of-a-bitch came over there and insulted me,' and he turned and went back towards his business"; that he had a knife in his hand at the time.

The testimony of appellant showed that he then told his son to get his gun out of his store and bring it to him, which he did, and he remained at the front of his store with his gun.

Willis Lawrence swore that not long after the killing appellant came by his house, called him out and asked him if he got to Mr. Carmichael before he died and asked him if he saw a pistol. Witness told him he did not. He swore appellant then said that deceased came up and asked him what his boy had done, and that he told him that he was throwing up sand, and that he told him he would whip him—he was talking about the boy—and that he told him (Carmichael) he could whip him. And he said he (Davis) tried to get out his knife and did get it out, and that Mr. Carmichael caught his hands and held them and was pushing him backwards trying to trip him; that when he fell he fell across him, and that gave him a chance to open his knife, and he said that he cut him across the arm, and that he put his hands on him and jumped up, and that when he jumped up he stabbed him.

Appellant himself swore that he cut deceased twice with his knife; once when he was falling or just as he fell, and the other just after both he and deceased had gotten up.

The whole affair from start to finish embraced only a very short period of time and was all one transaction, and occurred at one time.

The court's definition of malice aforethought was in accordance with the well established definition thereof by the decisions of this court and as defined by Judge White in section 1225 of his Ann. P. C., which was quoted and approved in the late decision in the Lewellen case, not yet reported.

The court's charge on self-defense, together with appellant's special charge, which the court gave, correctly presented and applied that ques-

tion to the evidence. Hence it was unnecessary to give any other of appellant's special charges on this subject.

Immediately after appellant had cut and stabbed deceased, deceased went directly to his store and died there in a very few minutes, and as soon as he reached there his wife testified he told her, "Oh, mother, he has got me this time. He was to blame. He jumped on me." Appelland objected, as his bill states, "To the witness (Mrs. Carmichael) being permitted to relate to the jury the said purported statements of the deceased upon the ground that the same were merely his conclusions and were irrelevant, immaterial and prejudicial to the rights of the defendant." The court overruled his objection, permitting her to so testify.

There can be no doubt but that these statements by the deceased were res gestae and under the authorities were admissible as a shorthand rendering of the facts.

In Clark v. State, 56 Texas Crim. Rep., 296, appellant offered to prove his res gestae statement to the policeman when he surrendered the pistol with which he had killed deceased. He said to the policeman that he "had killed the deceased in self-defense." On the State's objection the court below excluded that statement on the ground that it was a conclusion and not a statement of fact. In an opinion of this court by Judge Ramsey it was held that this testimony was admissible, saying, "That the declaration was somewhat in the form of a conclusion is undeniable. As to whether in any case one has acted in self-defense, or kills another in self-defense, may be a mixed question of law and fact, and yet it seems clear that, where one in agony or excitement makes a declaration that he had shot another in self-defense, it is, after all, something more than a conclusion and is equivalent to the affirmation that he had shot his assailant in protection of his own person or his own life. It is a shorthand rendering of the facts, and is consistent alone, and embraces the statement that the act was done not in aggression, but for the purpose of warding off or preventing injury or death," citing a large number of authorities. In the Bateson case, 46 Texas Crim. Rep., 34, this court had held that this testimony, towit, "They murdered me without cause," was inadmissible because a conclusion. In said Clark case the court through Judge Ramsey said that that decision was not correct and overruled it and all that line of authorities.

In Lockhart v. State, 53 Texas Crim. Rep., 589, this court held that this testimony was admissible: deceased's wife asked him what was the cause of him (appellant) shooting him, and he replied, "For nothing. He killed me for nothing."

In Craft v. State, 57 Texas Crim. Rep., 257, witnesses were permitted to testify to the dying declarations of the deceased as follows: "Son killed me for nothing. I could not run out of it, I could not beg out of it." In the opinion written by Judge Davidson, he says: "The Clark case reviews the authorities upon which appellant relies for a reversal on this question and overrules them. For a discussion of the matter see Clark's case, supra," and cites the Lockhart and Clark cases, supra.

In Roberts v. State, 5 Texas Crim. App., 150, this court held that this dying declaration of the deceased was admissible, towit: "That Steve Roberts had killed him for nothing." In Connell v. State, 46 Texas Crim. Rep., 259, this court held that the dying declaration of the deceased, that his son "ought not have done it (killed him), and that he had no cause for doing it," was held admissible.

In Sims v. State, 36 Texas Crim. Rep., 154, this statement of deceased as his dying declaration: "Sims ought not to have shot me" and "I did not think Sims was going to shoot," was held admissible.

See also Pierson v. State, 18 Texas Crim. App., 524; Gaines v. State, 58 Texas Crim. Rep., 631; Lane v. State, 59 Texas Crim. Rep., 595; Meyers v. State, 37 Texas Crim. Rep., 208; Lewis v. State, 33 Texas Crim. Rep., 618; Allen v. State, 8 Texas Crim. App., 67; Miller v. State, 18 Texas Crim. App., 232; and see particularly section 1093½, subdivision 2, of White's Ann. C. C. P., wherein he cites and reviews many cases holding that such testimony was admissible as a shorthand rendering of the facts.

There can be no doubt but that the statement of deceased to his wife: "Oh, mother, he has got me this time. He jumped on me," was properly admissible. As shown by appellant's bill these two statements and the other, "He was to blame," were all included in one statement made at the same time by deceased to his wife. As shown, the bill objected to the whole statement. He did not object separately to the one, "He was to blame." Under such circumstances the bill would present no error, as has uniformly been held by this court. In the recent case of Martin v. State, 80 Texas Crim. Rep., 199, this court held: "It is well settled that where evidence is introduced over objection, some of which is admissible and some of it is not, but all is together objected to, no error is shown. That in order to point out any error, the objection must be specially to the particular portion which is inadmissible. Clearly all of the testimony of this witness was admissible except what they asked Dock and his reply. He did not object to this specially, but included it, as stated, in his objections to the whole. This presents no error. Ortiz v. State, 68 Texas Crim. Rep., 524, 151 S. W. Rep., 1056; Payton v. State, 35 Texas Crim. Rep. 508, 34 S. W. Rep., 615; Gaines v. State, 37 S. W. Rep., 331; Tubb v. State, 55 Texas Crim. Rep., 606, 117 S. W. Rep., 858; Cabral v. State, 57 Texas Crim. Rep., 304, 122 S. W. Rep., 872; Hughes v. State, 68 Texas Crim. Rep., 584, 152 S. W. Rep., 912; Pinkerton v. State, 71 Texas Crim. Rep., 195, 160 S. W. Rep., 87; Boyd v. State, 72 Texas Crim. Rep., 521, 163 S. W. Rep., 67; Lopez v. State, 73 Texas Crim. Rep., 624, 166 S. W. Rep., 154; Francis v. State, 75 Texas Crim. Rep., 362, 170 S. W. Rep., 779; Zweig v. State, 74 Texas Crim. Rep., 306, 171 S. W. Rep., 747; Ghent v. State, 70 Texas Crim. Rep., 518, 176 S. W. Rep., 566; Aven v. State, 76 Texas Crim. Rep., 642, 177 S. W. Rep., 82; 1 Thomp. on Tr. (2nd ed.), 696." There is also another well established rule that when substantially the

same testimony is given by some other witness to which there is no objection, the admission of other evidence objected to presents no error.

Obie Davis, appellant's witness and son, swore that on the way from where appellant stabbed deceased to his store, deceased said to his wife, "Uh, Ethel, I am murdered.". Ethel was the given name of Mrs. Carmichael. Mr. Belk, one of appellant's witnesses, on his direct examination swore that when Mr. Carmichael was going to his store from where he was stabbed by appellant he said to his wife: "Mother, he has killed me." Appellant made no objections to this testimony by either of these witnesses. While not literally the same as "he got me this time," it is substantially the same. In Wagner v. State, 53 Texas Crim. Rep., 306, this court through Judge Ramsey held: "It is well settled in this State that an erroneous admission of testimony is not cause for reversal if the same evidence is presented by other testimony and not objected to." He cites many authorities. See also Tinker v. State, 77 Texas Crim. Rep., 506, 179 S. W. Rep., 572; Bailey v. State, 6 Texas Crim. App., 484; Christy v. State, 69 Texas Crim. Rep., 598.

The judgment is affirmed.

*Affirmed.*

ON REHEARING.

June 12, 1918.

PRENDERGAST, Judge.—Appellant's able attorney at the time this motion was submitted made a vigorous, elaborate and plausible argument. In addition, he has filed an able brief. He again presents some of the questions which were thoroughly considered and decided against him by the original opinion. His argument and brief have had full consideration. It is unnecessary to discuss again but two of his contentions.

The first is his claim that the testimony of Mrs. Carmichael, the wife of deceased, wherein she testified to the res gestae statement of her husband, as follows: "Oh, mother, he has got me this time. He was to blame. He jumped on me," was inadmissible. This matter, as shown by his bill and the record was fully stated in the original opinion and was correctly disposed of therein. However, the other members of this court are of the opinion that if proper objection had been made to the one statement, "He was to blame," it should have been excluded. This writer is of the decided opinion that this sentence was admissible under the authorities. All members of the court agree that the other two statements objected to were admissible. As stated and held in the original opinion, this one statement "he was to blame" not having been objected to separately but with the other two, and as a whole, presents no reversible error, as more fully stated and held in the original opinion.

The other question is whether the refusal of the court to give his charge, as hereinafter stated, presents reversible error. Self-defense was the appellant's defense. The court, in his main charge on that subject gave this instruction: "Every person is permitted by law to defend himself against an unlawful attack threatening injury to his person, and

is justifiable in using all necessary or reasonable force to defend himself, but no more than the circumstances, viewed from the standpoint of the defendant, reasonably indicated to be necessary. Homicide is justified by law if committed in defense of one's person against any unlawful or violent attack made in such a manner as to produce a reasonable expectation or fear of death or some serious bodily injury. It is not necessary to the right of self-defense that the danger should in fact exist; it may be only apparent and not real; if it reasonably appears, from all the circumstances of the case, that danger exists the person threatened with such apparent danger has the same right to defend himself against it, and to the same extent that he would if the danger were real; and in determining the appearances it must be viewed from the standpoint of the defendant alone at the time and from no other standpoint; but the defendant is not required to retreat in order to avoid the necessity of killing his assailant." And there stopped his charge on this subject. It will be seen from this that no charge applying the law to the facts was given by the court, but no objections were made by the appellant to the charge on that account at all. Doubtless that is accounted for by the fact of the court giving the appellant's charge on the subject applying the facts to his claimed self-defense. The specially requested charge by appellant and given just as requested by him is as follows: "The defendant requests the court to charge the jury as follows: Gentlemen of the jury: You are instructed that if, viewing all the circumstances in evidence from the standpoint of the defendant and from no other standpoint, you believe from the evidence that at the time when the defendant inflicted the wound which caused the death of the deceased it then reasonably appeared to the defendant, from the acts of the deceased, and the situation of the parties, that he, the defendant, was then in danger of death or some serious bodily injury at the hands of the deceased, or if from the evidence you have a reasonable doubt of the foregoing, then in either event it will be your duty to find the defendant not guilty of murder, and also to find him not guilty of manslaughter, even though you should believe from the evidence that the defendant was not laboring under or actuated by such reasonable fear of death or serious bodily injury at the time when he inflicted on the deceased some other wound which did not cause his death.

"But you are further instructed that in deciding from the evidence whether, in inflicting the wound which caused the death of the deceased, the defendant committed murder, or committed manslaughter or acted in his self-defense and was justified, under the law as stated to you in the court's main charge, you will consider all of the wounds inflicted upon the deceased by the defendant, together with all of the other facts and circumstances in evidence."

It will be seen therefrom that the court in no way by his charge or otherwise limited or restricted appellant in his claimed self-defense. He gave no charge at all on provoking the difficulty. When that is the case the uniform holding of this court in a large number of cases is,

that the court should not give any charge on the subject of the appellant's right to arm himself in preparation for any attack or contemplated attack by deceased upon him. Smith v. State, 81 Texas Crim. Rep., 368; Williams v. State, 201 S. W. Rep., 188; Willifred v. State, 38 Texas. Crim. Rep., 39ᴀ; Ford v. State, 77 Texas Crim. Rep., 252, 177 S. W. Rep., 1176; Carey v. State, 74 Texas Crim. Rep., 112; Fox v. State, 71 Texas Crim. Rep., 318; Holmes v. State, 69 Texas Crim. Rep., 588; Crippin v. State, 80 Texas Crim. Rep., 293, 189 S. W. Rep., 496. Therefore the court did not err in refusing his special charge to the effect that if appellant from his standpoint and the conduct, words and manner of the deceased, etc., it reasonably appeared to appellant that deceased was about to attack him and he could not otherwise defend himself, "then the law did not require the defendant to stand and wait for such attack to actually begin before getting his knife, but the defendant had the right in such situation, if you find that it existed, to prepare to defend himself against such anticipated attack, if any, by getting his knife in his hand so as to be in position to use it if necessary in defending himself against such attack upon him by the deceased." This requested charge was not the law applicable to this case as shown by the principles laid down in the decisions above noted. Nor did the court err in refusing his charge No. 2, which presented substantially the same thing.

The motion is overruled.

*Overruled.*